ANGELO PELOSI, Plaintiff–Appellant, v. WAILEA RANCH ESTATES, a Hawai'i General Partnership, JOHN KEAN, STEPHEN PITT, SATISH GHOLKAR, EDUARDO F. BELLO, HUGH JEFFREY FARRINGTON, STEPHEN K. RINK, STEPHEN M. SWANSON, LOUISE S. SWANSON, MARGARET S. SMITH, BATTE T. L. SMITH, NAHBUT L. SMITH, PETER TUCKER, LYNNE COLEMAN TUCKER, MARC O. YOSHIZUMI, DAVIS ROLAND KING, DORIAN KEYES KING, DENNIS RUSH, CINDY RUSH, O'GREEN ESTATE, BOB NICK OOSTERVEEN, DIANE OOSTERVEEN, JANE GREENSPUN, RONALD G. MANN, EDNA JOAN MANN, STEPHEN FOWLER CHADWICK, ANNICE BUCKNER CHADWICK, GERALD K. WONG, CHU IL WONG, JOHN DOES 1–10, JANE DOES 1–10, DOE PARTNERSHIPS 1–10, DOE CORPORATIONS 1–10, and DOE GOVERNMENTAL ENTITIES 1–10, Defendants–Appellees

NO. 15585

(CIV. NO. 88–0422(3))

JUNE 22, 1994
(As Amended by Order Filed July 7, 1994)

BURNS, C.J., HEEN, AND WATANABE, JJ.

## OPINION OF THE COURT BY WATANABE, J.

This appeal involves the interpretation of a restrictive covenant which precludes houselots in the Maui Meadows III (MM III) Subdivision from being used "except for residential purposes." The primary issue is whether the general partnership which owned one of the houselots breached the covenant when it constructed across its houselot a roadway to an adjoining subdivision and a tennis court for use by the residents of the adjoining subdivision.

We conclude that a breach of the covenant occurred. Accordingly, we reverse those parts of the circuit court's judgments which concluded otherwise and remand for proceedings consistent with this opinion.

## BACKGROUND

Since 1977, Plaintiff–Appellant Angelo Pelosi (Plaintiff) has owned and lived on Lot 28 of the MM III Subdivision, which is located in a "Rural District"[1] in Kihei, Maui. Adjoining Plaintiff's lot is Lot 29, which is the focus

---

[1] Pursuant to Hawai'i Revised Statutes (HRS) § 205–2 (Supp. 1992), land in Hawai'i is classified by the state land use commission into one of four major land use districts: urban, rural, agricultural, and conservation. With regard to rural districts, HRS § 205–2 provides in relevant part:

> **Districting and classification of lands.** (a) ... The [land use] commission shall set standards for determining the boundaries of each district, provided that:
>
> * * *
>
> (2) In the establishment of boundaries for rural districts, areas of land composed primarily of small farms mixed with very low density residential lots, which may be shown by a minimum density of not more than one house per one–half acre and a minimum lot size of not less than one–half acre shall be included, except as herein provided;
>
> * * *
>
> (c) Rural districts shall include activities or uses as characterized by low density residential lots of not more than one dwelling house per one–half acre, except as provided by county ordinance pursuant to section 46–4(c), in areas where "city–like" concentration of people, structures, streets, and urban level of services are absent, and where small farms are intermixed with low density residential lots except that within a subdivision, as defined in section 484–1, the [land use] commission for good cause may allow one lot of less than one–half acre, but not less than 18,500 square feet, or an equivalent residential density, within a rural subdivision and permit the construction of one dwelling on such lot, provided that all other dwellings in the subdivision shall

of this lawsuit. The houselots in the MM III Subdivision are all subject to a "Declaration of Restrictive Covenants" (MM III Covenants), recorded with the Bureau of Conveyances, the purpose of which is to "[establish] and [insure] a sound and proper subdivision for residential purposes[.]" Plaintiff's Exhibit 3 at 1, ¶ 1.

The MM III Covenants describe the MM III Subdivision as "consisting of 273 houselots and fifteen roadway parcels[.]" *Id.* However, the roadway parcels are specifically exempted from the MM III Covenants. *Id.* The covenant at the center of this dispute provides:

> No lot shall be used except for residential purposes. No building shall be erected, placed or permitted to remain on any lot other than a single family dwelling not to exceed one and one–half stories in height and any accessory buildings.

*Id.* at 2, ¶ 1.

To the north of the MM III Subdivision is property formerly owned by 'Ulupalakua Ranch (Ranch) and classified as part of an "Agricultural District."[2] In 1985, Ranch

---

have a minimum lot size of one–half acre or 21,780 square feet. Such petition for variance may be processed under the special permit procedure. These districts may include contiguous areas which are not suited to low density residential lots or small farms by reason of topography, soils, and other related characteristics.

[2] HRS § 205–2(a)(3) (Supp. 1992) states that "[i]n the establishment of the boundaries of agricultural districts the greatest possible protection shall be given to those lands with a high capacity for intensive cultivation[.]" HRS § 205–2(d) (Supp. 1992) further provides:

> Agricultural districts shall include activities or uses as characterized by the cultivation of crops, orchards, forage, and forestry; farming activities or uses related to animal husbandry, aquaculture, and game and fish propagation; aquaculture, which means

consolidated and resubdivided this property into two large parcels, one of which was a twenty–acre lot abutting that portion of the north end of the MM III Subdivision, which includes Lots 28 and 29. Ranch also acquired title to Lot 29, which adjoined Plaintiff's Lot 28, and proceeded to consolidate Lot 29 with the twenty–acre parcel.

Ranch initially planned to subdivide and develop the resultant 20.5–acre parcel. However, by a deed dated August 26, 1986, Ranch conveyed the entire parcel to Defendant–Appellee Wailea Ranch Estates, a Hawai'i general partnership whose partners are Defendants John Kean, Stephen Pitt, Satish Gholkar, Eduardo F. Bello, Hugh Jeffrey Farrington, and Stephen K. Rink. (The

the production of aquatic plant and animal life for food and fiber within ponds and other bodies of water; wind generated energy production for public, private, and commercial use; bona fide agricultural services and uses which support the agricultural activities of the fee or leasehold owner of the property and accessory to any of the above activities, whether or not conducted on the same premises as the agricultural activities to which they are accessory, including but not limited to farm dwellings as defined in section 205–4.5(a)(4), employee housing, farm buildings, mills, storage facilities, processing facilities, vehicle and equipment storage areas, and roadside stands for the sale of products grown on the premises; wind machines and wind farms; small–scale meteorological, air quality, noise, and other scientific and environmental data collection and monitoring facilities occupying less than one–half acre of land, provided that such facilities shall not be used as or equipped for use as living quarters or dwellings; agricultural parks; and open area recreational facilities, including golf courses and golf driving ranges; provided that they are not located within agricultural district lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B.

These districts may include areas which are not used for, or which are not suited to, agricultural and ancillary activities by reason of topography, soils, and other related characteristics.

partnership and partners will hereinafter be collectively referred to as "WRE.") WRE proceeded with Ranch's plans to develop the 20.5–acre parcel into a subdivision.

The County of Maui required WRE to execute a "Farm Dwelling Agreement" before proceeding with any development. In signing the agreement, WRE covenanted that any dwelling located on a lot in the Wailea Ranch subdivision would be a "farm dwelling," occupied only by a family "who derive[s] income from the agricultural activity on the parcel." Plaintiff's Exhibit 10 at 4, Nos. 3 and 4.

Despite the foregoing covenant, WRE proceeded to develop on said parcel an "exclusive, large lot subdivision" called Wailea Ranch Estates (Wailea Ranch), "[d]esigned to cater to a discerning class of people . . . who have made a life's business out of knowing the difference between the good and the truly extraordinary." Wailea Ranch marketing brochure, Plaintiff's Exhibit 12 at 1, 6.

WRE subdivided the 20.5–acre parcel into nine two–acre lots and three roadway lots, all of which were made subject to a recorded set of restrictive covenants (Wailea Covenants), designed to ensure the exclusive nature of the subdivision.[3] One of the roadway lots, designated as "Lot 10" on the Wailea Ranch Subdivision Map, included

---

[3] The Wailea Covenants, for example, require all improvements to be approved by a design committee and constructed in strict compliance with design and construction standards and restrictions meant to enhance the high quality nature of the subdivision. WRE's Exhibit C at 17, No. 17. Moreover, despite the agricultural classification of the Wailea Ranch lands, horses, cows, goats, or swine are prohibited by the covenants, and "animals, fish or fowl . . . which are a nuisance to neighbors" are prohibited by the design and construction standards and restrictions. Record on Appeal (R.A.), Volume 1 at 200. Furthermore, strict landscaping requirements inconsistent with farming are established for each lot, id. at 203–04, and prior approval of the Board of

a portion of Lot 29 of the MM III Subdivision. To provide access to Wailea Ranch, a roadway with a private entry gate was constructed across Lot 29. Additionally, a private tennis court for the exclusive use of the residents of Wailea Ranch was built on the remaining portion of Lot 29.

The parties disagree as to when Plaintiff became aware that Lot 29 was to be used for a roadway and tennis court for Wailea Ranch. One of the general partners of WRE testified that several of the Wailea Ranch lots were listed for sale in the Multiple Listing Service for Realtors in late 1986 and that a brochure describing the project was delivered to Plaintiff in "October or November of 1986." Transcript (Tr.) 9/28/90 at 51.

Plaintiff testified that he did not become aware of the proposed use of Lot 29 until WRE cleared Lot 29 in April 1987 and began using it for access to the planned subdivision. According to Plaintiff, he immediately called one of the partners of WRE and requested information about the project. Plaintiff subsequently received a brochure, which indicated that the designated access to Wailea Ranch would be a roadway across Lot 29. The brochure also mentioned that a community tennis court would be built for the exclusive use of Wailea Ranch residents. Although the

---

Directors of the Wailea Ranch Estates Association is required to engage in any gainful occupation on any lot. WRE's Exhibit C at 16, No. 14.

Although the enforcement of the State of Hawai'i's land use laws is not before us in this case, we are extremely troubled by WRE's apparent use of the restrictive covenants to privately rezone land that is classified for agricultural use and thereby create large estates for the wealthy, who have no intention of maintaining the land for agricultural purposes.

brochure did not indicate where the tennis court would be located, Plaintiff became concerned that it would be built on Lot 29. His concerns were heightened when workers at the site would not inform him about the exact plans for Lot 29.

Plaintiff thereafter initiated calls and letters to the County of Maui, seeking to determine, from subdivision maps filed with the County by WRE, what was planned for Lot 29. Initially, the County indicated that no tennis court had been approved for Lot 29. Subsequently, however, the County confirmed that Lot 29 would be used for a roadway and tennis court, and that such uses did not violate any state or county land use or zoning laws and ordinances.

Plaintiff protested to WRE that the proposed use of Lot 29 nevertheless violated the MM III Covenants. However, WRE proceeded to pave the roadway across Lot 29 in late 1987, and completed the tennis court in August 1988.

## PROCEDURAL HISTORY

On August 26, 1988, Plaintiff filed a six–count Complaint against WRE and Doe Defendants, later identified as the individual lot owners of Wailea Ranch who owned an undivided interest in Lot 29 (collectively, Defendants). The complaint alleged that: (1) Defendants breached paragraph (1) of the MM III Covenants by using Lot 29 for other than residential purposes; (2) Defendants' use of Lot 29 as a roadway and tennis court constituted a nuisance; and (3) as a result of Defendants' breach and nuisance, Plaintiff suffered and continued to suffer physical, mental, and emotional distress and a diminution in the value of Lot 28.

Plaintiff sought the following remedial relief: (1) a declaratory judgment that Defendants had breached the MM III Covenants because they were not using Lot 29 for residential purposes; (2) a permanent injunction prohibiting the further use of Lot 29 as a roadway and tennis court; and (3) an award of special, general, compensatory, and punitive damages.

The individual lot owners of Wailea Ranch (Individual Defendants) thereafter filed a five–count counterclaim against Plaintiff.

On April 19, 1990, Plaintiff filed a Motion for Partial Summary Judgment, asking the circuit court to summarily decide that Lot 29 was not being used "for residential purposes." The circuit court denied the motion without explanation on May 29, 1990.

On June 7, 1990, Plaintiff filed a Motion for Summary Judgment on Counts 1, 2, and 3, and for Dismissal of Counts 4 and 5 of Individual Defendants' counterclaim.

By an order dated July 25, 1990, the circuit court dismissed Count 4 of Individual Defendants' counterclaim, which had sought damages from Plaintiff for allegedly maliciously and in bad faith instituting civil proceedings against Individual Defendants. Thereafter, on August 23, 1990, the circuit court filed judgment in Plaintiff's favor on Counts 1, 2, and 3 of Individual Defendants' counterclaim, which involved allegations that Plaintiff had violated the MM III Covenants by building a two–story home on Lot 28.[4] The only count of Individual Defendants' counterclaim to be tried, therefore, was

---

[4] The MM III Covenants restrict buildings to a height not exceeding one and one–half stories.

Count 5, which alleged that Plaintiff had interfered with Individual Defendants' existing contracts and prospective economic advantages by filing this lawsuit.

Trial of the case commenced on September 24, 1990, and at the conclusion of the trial, the jury was presented with a special verdict form containing seven questions. The first question asked the jury whether they "find that Defendants are using Lot 29 of Maui Meadows Subdivision – Unit III for residential purposes?" The jury answered, "Yes." In response to the remaining questions, the jury found that Defendants' use of Lot 29 constituted a nuisance to Plaintiff, that Plaintiff had been damaged as a result, and that Plaintiff had suffered $20,000 in general and compensatory damages. The jury also denied the one remaining count of Individual Defendants' counterclaim against Plaintiff. Record on Appeal (R.A.), Volume 4 at 824–25.

On December 11, 1990, the circuit court entered its Judgment on Special Verdict. Defendants received judgment on Count 1 of Plaintiff's Complaint, which was a final determination that Defendants' use of Lot 29 did not violate the MM III Covenants. Plaintiff received judgment and an award of $20,000 on Counts 2, 5, and 6 of the Complaint, the nuisance cause of action. Finally, judgment was entered for Plaintiff on the remaining count of Individual Defendants' counterclaim.

Additionally, on December 6, 1990, the circuit court entered Findings of Fact (FsOF) and Conclusions of Law (CsOL) adverse to Plaintiff on Counts 3 and 4 of Plaintiff's Complaint, which requested injunctive relief and declaratory relief, and on April 30, 1991, judgment was entered for Defendants and against Plaintiff on these counts.

On May 10, 1991, Plaintiff filed a motion seeking various forms of post–trial relief, which the trial court denied by a July 12, 1991 order. This timely appeal followed.

Plaintiff contends that the trial court committed seven reversible errors: (1) the trial court erred in denying his Motion for Partial Summary Judgment, since it is undisputed that Lot 29 was being used for a roadway and tennis court; (2) the trial court committed error when it denied his request for declaratory judgment, since the evidence clearly showed that Lot 29 was not being used for residential purposes; (3) the trial court erroneously allowed an attorney to testify about the legal standards to be applied to the interpretation of restrictive covenants; (4) the trial court erred in giving several instructions to the jury; (5) error was committed when the trial court denied Plaintiff's motion for a new trial; (6) the trial court erroneously entered several findings of fact and conclusions of law; and (7) the trial court abused its discretion when it refused to grant Plaintiff an injunction to abate the nuisance occurring on Lot 29.

We find it unnecessary to address Plaintiff's third, fourth, fifth, and sixth points of error regarding the conduct of the trial below since we conclude, as a matter of law, that Defendants breached the restrictive covenant in question.

## DISCUSSION

### I.

### Interpretation of the Restrictive Covenant

#### A.

In construing restrictive covenants governing the use of land, we are guided by the same rules that are

applicable to the construction of contracts. *DeMund v. Lum*, 5 Haw. App. 336, 343 n.7, 690 P.2d 1316, 1322 n.7, *cert. denied,* 67 Haw. 685, 744 P.2d 781 (1984). The fundamental rule is that the intent of the parties, as gleaned from the entire context of the covenant, governs. *Id.* at 342, 690 P.2d at 1321. As long as the terms of a covenant are not ambiguous, *i.e.*, not "capable of being reasonably understood in more ways than one," we are required to interpret the terms "according to their plain, ordinary, and accepted sense in common speech." *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992).

The preliminary question of whether a covenant is ambiguous is a question of law that may be resolved on summary judgment. 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE: *Civil 2d* § 2730.1, at 275–79 (1983). Moreover, if the language of the covenant is clear and unambiguous, and the meaning of the covenant can be readily discerned from the instrument itself, the legal effect and construction of the covenant is a question of law, appropriate for summary judgment disposition. *Id.* at 279–81; *Fassler v. Okemo Mountain, Inc.*, 148 Vt. 538, 540–41, 536 A.2d 930, 931 (1987).

In the present case, the stated purpose of the MM III Covenants is to "[establish] and [insure] a sound and proper subdivision for *residential* purposes." Plaintiff's Exhibit 3, at 1, ¶ 1 (emphasis added). The MM III Covenants clearly distinguish between "*house*lots," which are subject to the MM III Covenants, and "roadway parcels," which are not, thus indicating that in the MM III Subdivision, roadways were intended to be constructed on parcels other than houselots.

The first covenant expressly prohibits any houselot from being used "except for *residential* purposes" (emphasis added). The term "residential" is commonly understood to relate to a "residence" or "dwelling." THE NEW WEBSTER ENCYCLOPEDIC DICTIONARY OF THE ENGLISH LANGUAGE 715 (1952).

The first covenant also states that "[n]o building . . . other than a *single family dwelling* not to exceed one and one–half stories in height and any accessory buildings" shall be "erected, placed or permitted to remain on any [house]lot," Plaintiff's Exhibit 3 at 2, No. 1 (emphasis added). The covenant thus restricts the type of structure that can be built on the houselots to a dwelling occupied by one family only.

In our view, the clear and unambiguous terms of the MM III Covenants, construed in accordance with their plain, ordinary, and accepted meanings, lead to but one conclusion: only one single–family dwelling and such buildings as are strictly accessory to the use of that dwelling may be constructed on an MM III houselot. Since Lot 29 contains no single–family dwelling, and the roadway and tennis court on Lot 29 are accessory to residences in a completely different subdivision, the restrictive covenant was clearly breached.

## B.

Defendants claim that because Wailea Ranch is a residential subdivision, Lot 29 may be used for a roadway and tennis court incidental to that subdivision. In support of their position, Defendants cite cases from other jurisdictions which they claim allowed a "roadway" across a lot restricted to "residential purposes."

Many of the cases cited by Defendants, however, are distinguishable on their facts. For example, a number of

the cases involved "driveways" to another residence, rather than a "roadway" or "street" to another subdivision. *See, e.g., Billiet v. Aulgur*, 18 Mich. App. 391, 171 N.W.2d 463 (1969); *R.R. Improvement Ass'n v. Thomas*, 374 Mich. 175, 131 N.W.2d 920 (1965); *Lapray v. Smith*, 804 S.W.2d 87 (Tenn. App. 1990), *appeal denied* (Jan. 28, 1991). The facts involved in *Vinyard v. St. Louis County*, 399 S.W.2d 99 (Mo. 1966), were unique and complicated, and the covenant in question placed limits on the type of structure that could be built on a lot rather than on the use of the land itself. Several of the cases cited by Defendants involved the power of a government agency to condemn land subject to a restrictive covenant for the purpose of building a public street. *See, e.g., City of Ste. Genevieve v. Ste. Genevieve Ready Mix, Inc.*, 765 S.W.2d 361 (Mo. App. 1989); *Dierberg v. Wills*, 700 S.W.2d 461 (Mo. App. 1985).

Moreover, the majority of courts which have addressed disputes similar to the instant case have prohibited the use of a roadway to another subdivision across a lot that is restricted to "residential" use.

For example, in *Thompson v. Squibb*, 183 So. 2d 30, 31 (Fla. App. 1966), the defendants created a subdivision known as Mobile Homes Estates, which was subject to the following restrictive covenant:

> All land included in Mobile Homes Estates shall be used *for residential purposes only*, except such lots, blocks or parcels as may be hereafter designated for other purposes by the Committee.

(Emphasis added). The plaintiffs subsequently purchased property adjacent to Mobile Homes Estates and also acquired a 30–foot–wide strip of one of the Mobile Homes Estates lots. They then created a subdivision

called Thompson's Estate on the adjoining land and built an access roadway to the new subdivision across the strip of land which constituted part of Mobile Homes Estates. A Florida trial court issued a mandatory injunction, prohibiting use of the connecting roadway and ordering removal of all paving surfaces. On appeal, the Florida Court of Appeals affirmed, stating:

> There is no ambiguity in the expression "shall be used for residential purposes only." As employed in this covenant, the word "only" is synonymous with the word "solely" and is the equivalent of the phrase "and nothing else." Property restricted to use for residential purposes, so long as it is in good faith used for such, may be also used to a minor extent for the transaction of some classes of business or other pursuits so long as such is merely casual or unobtrusive and results in no appreciable damage to neighboring property nor inconvenience, annoyance or discomfort to neighboring residents. However, such additional use must be reasonably incidental to residential uses and such an inconsequential breach of the covenant as to be in substantial harmony with the purpose of the parties in making the covenants, and without substantial injury to the neighborhood.
>
> It is obvious that the use of defendant's lot as a connecting street so that there would be access from the streets of the adjoining subdivision to those of the subdivision for whose benefit the restrictive covenants were made is not in any sense a residential use or a use incidental thereto.

*Id.* at 32–33 (citations omitted).

In *Rush v. Miller*, 21 Wash. App. 156, 584 P.2d 960 (1978), the trial court enjoined the defendants from building a roadway across a lot in Johnson Estates, which defendants had purchased and partially incorporated in an adjoining subdivision called Shadywood. The lots in Johnson Estates were subject to a restrictive covenant providing that "[a]ll lots shall be used for residential purposes, unless otherwise zoned." *Id.* at 157, 584 P.2d at 961. In affirming the injunction, the Washington Court of Appeals held:

> Unambiguous language in a covenant will be given its plain and reasonable meaning; the courts will not apply a rule of construction where it will defeat the obvious purpose of the restriction. On the facts before us we find that the term "residential" has a clear meaning and agree with those courts which hold that a roadway which is designed primarily to benefit or serve property outside a restricted subdivision is simply not a residential purpose.

*Id.* at 160, 584 P.2d at 963 (citations omitted).

In *A.A. Home Improvement Co. v. Hide–a–Way Lake Club, Inc.*, 393 So. 2d 1333 (Miss. 1981), the subdivider of a private subdivision brought an action seeking to enjoin the use of a lot within the subdivision from being used as a thoroughfare to another subdivision. The lot was subject to a restrictive covenant which provided: "No lot shall be used for other than residential purposes (except as elsewhere herein provided)." *Id.* at 1335. In affirming the trial court's grant of an injunction, the Supreme Court of Mississippi concluded:

> There is no ambiguity in the expression "No lot shall be used for other then [sic] residential

purposes." Any additional use must be reasonably incidental to residential uses and such an inconsequential breach of the covenant as to be in substantial harmony with the purpose of the parties in making the covenants, and without substantial injury to the neighborhood. It is obvious that the use of Lot 52 on which there is no residence as a connecting roadway to an adjoining subdivision is not in any sense a residential use or a use incidental thereto. In this case, the sole purpose of the roadway is to provide a means of ingress and egress between two subdivisions. It destroys the self–contained aspect of the subdivision, and the security that goes along with it. It also imposes additional traffic on the roads of the subdivision.

*Id.* at 1336–37 (citation omitted).

Other cases have also concluded that a lot restricted to residential use could not be used as a roadway to an adjoining subdivision. *See, e.g., L.W., Inc. v. Trice*, 416 So. 2d 736 (Ala. 1982); *Briarwood Apartments v. Lieblong*, 12 Ark. App. 94, 671 S.W.2d 207 (1984); *Sherwood v. Rigsby*, 221 Ill. App. 3d 260, 581 N.E.2d 696 (1991), *appeal denied*, 143 Ill. 2d 648, 587 N.E.2d 1025 (1992); *Austin v. Durbin*, 160 Ind. App. 180, 310 N.E.2d 893 (1974); *Chase v. Joslin Management Corp.*, 128 N.H. 336, 512 A.2d 434 (1986); *Irish v. Besten*, 142 Misc. 2d 183, 536 N.Y.S.2d 956 (1989), *aff'd*, 158 A.D.2d 867, 551 N.Y.S.2d 659 (1990).

In the instant case, the restrictive covenant in question is clear and unambiguous and precludes construction of a roadway and tennis court. The trial court thus erred in denying Plaintiff's Motion for Partial Summary

Judgment, submitting the breach–of–covenant issue to the jury, and concluding that a roadway and tennis court on Lot 29 were permissible under the covenant. COL 1, R.A., Volume 4 at 819–20.

## II.

### The Appropriateness of a Mandatory Injunction

Having concluded that Defendants breached the restrictive covenant, we next consider whether Plaintiff is entitled to a mandatory injunction ordering Defendants to remove the roadway and tennis court from Lot 29.

Defendants argue that when the equities are balanced in this case, injunctive relief should be denied. Defendants claim they will suffer extreme hardship if an injunction is granted because Wailea Ranch would be landlocked [5] without the roadway access through Lot 29. Defendants also assert that because Plaintiff waited until after completion of the roadway and tennis court to file suit, the doctrine of laches should bar him from seeking injunctive relief.

While courts in the majority of jurisdictions do balance the equities and consider the relative hardship to the parties in determining whether to grant injunctive relief in situations involving breach of a restrictive covenant, 5 R. POWELL, POWELL ON REAL PROPERTY ¶ 679[3], at 60–150 (1993), the Hawai'i Supreme Court has ruled that such considerations are irrelevant when a property owner deliberately and intentionally violates a restrictive

---

[5] Plaintiff contends that there is a "fire break" road available to Defendants and that Lot 29 is merely the most convenient access to Wailea Ranch. Opening Brief at 28.

covenant or intentionally assumes the risk that the owner will be found to have violated the covenant. *Sandstrom v. Larsen*, 59 Haw. 491, 501, 583 P.2d 971, 979 (1978).

In *Sandstrom*, the supreme court affirmed a judgment ordering the appellants to remove the top story of their residence because it violated a restrictive covenant requiring that houses in the subdivision not exceed one and one–half stories in height. In rejecting contentions that the trial court was required to consider the relative hardships between the parties and to allow the defendants to present evidence of alternate remedies, such as damages, before issuing a mandatory injunction, the supreme court stated:

> A basic consideration in the enforcement of restrictive covenants "is that they are enforceable through the equitable relief afforded by an injunction." *McDonough v. W.W. Snow Construction Co.,* supra, [131 Vt. 436, 441, 306 A.2d 119, 122 (1973).] As such, because the court is enforcing an established legal right embodied in the covenants, "the relative hardships to the parties has no application to the award of final relief to the plaintiff." *Id.*

59 Haw. at 499, 583 P.2d at 978.

The supreme court went on to note that it was undisputed that the appellants were actually and constructively aware of the one–and–one–half–story height restriction, and yet had proceeded with construction of the second story despite warnings by several neighbors that a lawsuit would be filed against them if they did not cease construction. The court added that the appellants' mistaken reliance upon the incorrect advice of their architect that they were not in violation of the covenant did not

confer immunity upon them from injunctive relief and ruled that mandatory injunction was the proper remedy:

> We are convinced that where a property owner "deliberately and intentionally violates a valid express restriction running with the land *or intentionally 'takes a chance,'* the appropriate remedy is a mandatory injunction to eradicate the violation." (Emphasis added). *Peters v. Davis,* 426 Pa. 231, 238, 231 A.2d 748, 752 (1967). Appellants took just such a chance in proceeding with construction of the second story of their home. Therefore, mandatory injunctive relief was available to appellees without the necessity of consideration by the court below of the relative hardship between the parties.

* * *

> [W]hen either a deliberate and intentional or an assumed–risk violation of a restrictive covenant is shown, *a plaintiff is entitled to mandatory injunctive relief regardless of the relative damage which may ensue from the injunction.* Furthermore, it is held that a breach of a restrictive covenant may be enjoined even absent a showing of the amount of damage which has in fact been caused by that breach. *Marshall v. Adams,* 447 S.W.2d 57 (Ky. App. 1969); *see Dickstein v. Williams, supra* [571 P.2d 1169 (Nev. 1971)]; 7 G. THOMPSON, LAW OF REAL PROPERTY § 3172 (1962 Repl.). Clearly, then, mandatory injunctive relief was the proper remedy to which appellees were entitled, and we hold that the trial court properly ordered the removal of the top story of appellants' residence without allowing appellants

to introduce evidence relating to possible alternative remedies.

59 Haw. at 500–01, 583 P.2d at 978–79 (emphasis added).

Similarly, the record in the instant case contains evidence that WRE may have deliberately and intentionally violated the restrictive covenant, or at least intentionally assumed the risk of such violation. There is evidence, for example, that WRE completed construction of the roadway and tennis court despite Plaintiff's warnings that such construction was a violation of the covenant. There is also evidence that WRE was less than candid with Plaintiff about WRE's plans for Lot 29. Furthermore, the record reveals that Lot 29 was initially acquired by the wife of one of the officers of Ranch, who then conveyed the parcel to Ranch. It is unclear to us why Lot 29 was acquired in such a roundabout way, or whether WRE had prior knowledge that Lot 29 was to be acquired in such a manner, but the circumstances certainly raise suspicions and deserve further exploration.

## CONCLUSION

Based on the foregoing discussion, we conclude as a matter of law that the use of Lot 29 for a roadway and tennis court to serve the residents of Wailea Ranch violates the MM III Covenants.

The trial court therefore erred when it denied Plaintiff's motion for partial summary judgment, and we hereby reverse the trial court's May 29, 1990 Order Denying Motion for Partial Summary Judgment.

The trial court also erred when it denied Plaintiff's request for a declaratory judgment (Count 3 of the Complaint), and, accordingly, we hereby reverse that

portion of the April 30, 1991 Judgment denying Plaintiff a declaratory judgment.

This case is hereby remanded to the trial court, with instructions to determine whether mandatory injunctive relief is appropriate in light of the principles set forth by the Hawai'i Supreme Court in *Sandstrom, supra*.

If the trial court determines that Defendants deliberately and intentionally violated the MM III Covenants or intentionally assumed the risk of such violation, a mandatory injunction should issue forthwith, ordering Defendants to remove the roadway and tennis court on Lot 29.

If, on the other hand, the trial court determines that Defendants did not intentionally violate the MM III Covenants or intentionally assume the risk of such violation, then the trial court may balance the equities in determining whether to grant injunctive relief by ordering removal of the roadway and/or tennis court. If the trial court concludes that the relative hardships to the parties preclude an award of injunctive relief, then the trial court shall hold a hearing to determine whether Plaintiff is entitled to damages resulting from Defendants' breach of the MM III Covenants which are in addition to the $20,000 in damages already awarded to him for his nuisance cause of action.[6]

In summary, we reverse the trial court's May 29, 1990 Order Denying Motion for Partial Summary Judgment and that portion of the April 30, 1990 Judgment denying Plaintiff a declaratory judgment, and we remand this case

---

[6] Plaintiff was awarded $20,000 in general and compensatory damages for his nuisance cause of action. Defendants did not appeal this award.

to the trial court to determine whether mandatory injunctive relief or other damages should be granted to Plaintiff as a result of WRE's breach of the MM III Covenants.

*Edward F. Mason* (*Eugene S. Evans, Jr.*, with him on the briefs; Mason & Evans, of counsel) for plaintiff–appellant.

*Gary Robert* on the brief for defendants–appellees.