937 P.2d 925

Thomas Charles INGLEDUE and
Jacquelyne Lucille Ingledue,
Plaintiffs–Appellants,

v.

Norman Hill DYER and Cynthia Miller
Dyer, Defendants–Appellees.

No. 17289.

Intermediate Court of Appeals of Hawai'i.

March 7, 1997.

Certiorari Granted March 27, 1997.

Certiorari Dismissed May 28, 1997.

Peter V.N. Esser, on the briefs, Honolulu, for plaintiffs-appellants.

Anthony Y.K. Kim, on the brief, Honolulu, for defendants-appellees.

Before BURNS, C.J., KIRIMITSU, J., and Circuit Judge CHANG in place of WATANABE, J., recused.

KIRIMITSU, Judge.

Plaintiffs–Appellants Thomas Charles Ingledue and Jacquelyne Lucille Ingledue (the Ingledues), appeal the First Circuit Court's July 2, 1993 judgment in favor of Defendants-appellees Norman Hill Dyer and Cynthia Miller Dyer (the Dyers). The Ingledues contend that the trial court erred in: (1) failing to give adequate warning that the jury was an advisory jury; (2) depriving the Ingledues of their right to trial by jury; (3) requiring the Ingledues to prove damages before enjoining the Dyers' breach of a restrictive covenant; and (4) refusing to recognize the Ingledues' right to injunctive relief if

the violation was of the "risk-taking variety." We affirm the July 2, 1993 judgment for the reasons discussed below.

## I. FACTS

The Ingledues and the Dyers are next-door neighbors in Haiku Plantation in Kāne'ohe. Both of their properties are subject to certain covenants and restrictions of the Haiku Plantation Association (the Association), one of which provides that no owner in Haiku Plantation shall "change the grade or drainage" of his or her property "except in accordance with plans and specifications" first approved in writing by the Association.

In 1990, with the consent of the Association, the Dyers commenced excavation of a swimming pool on their property. On April 22, 1990, approximately 140 cubic feet of soil, resulting from the pool excavation, was deposited in the shape of a mound by the Dyers on their own property next to the Ingledues' adjoining lot line. The mound was intended to be utilized by the Dyers as part of their landscaping plans that were to be submitted by the Dyers to the Association for their approval.

On May 2, 1990, Jacqueline Ingledue wrote to the Board of Directors of the Association (the Board) and complained that the creation of the mound changed the grade and might alter the water drainage pattern of the Dyers' property. She also pointed out that under the Declaration of Protective Provisions for Haiku Plantations (Protective Provisions), this alteration of the grade or drainage of the Dyers' property required the Association's written approval.[1] She further requested that the Board disallow the grade and drainage changes and require the Dyers to restore the area "to its former state."

Because of the Board's concern about the possible adverse effects of the Dyers' landscaping proposal, which included retention of the mound, the Board suggested at its June 6, 1990 meeting that the landscaping plan be reviewed by a civil engineer. The Dyers hired Bernard Kea (Kea) for that purpose.

By letter dated June 22, 1990, Kea stated that "the alteration of the [Dyers'] land by the fill essentially appear to maintain that same drainage pattern, and does not increase any runoff onto the adjoining [Ingledue] property."

On June 28, 1990, Cynthia Dyer wrote to the Board, requesting approval of the Dyers' landscaping plan, including the mound.

The Board, at its July 3, 1990 meeting, considered the Dyers' request for approval, but delayed its decision to allow the Ingledues the opportunity to submit their own engineer's report on the effect of the alteration of the grade. At this same meeting, the Board indicated to the Dyers that, until the Ingledues' report was received, the mound could remain, and that pursuant to the Dyers' request, they could reshape the mound, stabilize the dirt on it, and get it planted with grass before the rainy season began. The Dyers made these changes to the mound.[2]

Seven months later, at the February 1991 Board meeting, the Ingledues submitted a written report dated February 27, 1991, from their own civil engineer, Kenneth Sakai (Sakai). The report concluded that "the improvements constructed by your neighbor have changed the drainage pattern.... Your yard may be subjected to erosive forces."

The Board, because of the conflicting reports of Kea and Sakai, again postponed

---

1. Section 10 of the Eight Supplemental Declaration of Protective Provisions for Haiku Plantations is entitled "Construction of Improvements" and provides in part that no owner in Haiku Plantations shall "change the grade or drainage" of his or her lot "except in accordance with plans and specifications ... first approved in writing by the [Haiku Plantation] Association [ (the Association) ]."

2. James Pollack (Pollack), president of the Board of Directors of the Association (the Board), testified that until the mound was contoured and

planted, the Board considered it to be a temporary stockpile of dirt. Such a stockpile did not require the Board's written approval because it was not a permanent grade change. However, Defendants–Appellees' Norman Hill Dyer and Cynthia Miller Dyer (the Dyers) compacting and planting of the mound, without final approval for their landscaping plans, was a "technical violation of Section 10" but was allowed because "the steps that [the Dyers] intended to take would reduce the likelihood of erosion and would reduce the size and bulk of the mound."

their decision regarding the Dyers' landscaping plan and appointed Board member Don Griffin (Griffin) to determine if some mutually acceptable resolution of this issue could be reached by the parties and their engineers.

On or about March 16, 1991, Griffin spoke with Kea and Sakai by telephone. According to Griffin, Sakai proposed three alternatives to remedy the situation. Griffin reported to the Board that one of the solutions would be to have the Dyers construct a trench on their property that would divert runoff away from the Ingledues' property.

At the May 8, 1991 Board meeting, the Griffin report and proposed solution were discussed, and it was suggested to the Dyers that they agree to the construction of the trench.

The Dyers had their engineer modify their landscaping plan in accordance with the Board's suggestion and submitted it for the Board's approval.

By letter dated May 10, 1991, the Board advised the Ingledues of the May 8th Board action.

However, the Ingledues had filed their suit on May 6, 1991 and served the Dyers on May 13, 1991.

The Board met on June 5, 1991. The minutes of that meeting indicate that the following action was taken by the Board in relation to the Dyers' request for approval: "Guest Norm Dyer presented a drainage plan to redirect the flow of water between the Dyer and Ingledue properties five feet from the property line of the Dyers' property eliminating most, if not all, the water that crosses onto the Ingledue property during heavy rains. The board approved the plan, 6 for and 1 abstention (C. Dyer), subject to obtaining necessary C & C approval."

The Dyers constructed the trench in late June 1991. Prior to construction of the trench, the Ingledues' attorney advised the Dyers' attorney that the construction of the trench was not a solution agreeable to the Ingledues.

The parties proceeded to trial on March 8, 1993.

The five counts of the Ingledue complaint sought: (1) a mandatory injunction (restoring the Dyers' property to its pre-mound elevation and grade) for breach of the restrictive covenant; (2) a mandatory injunction for breach of the common law duty of non-interference with surface waters in connection with the mound; (3) a mandatory injunction for breach of the common law duty of non-interference with surface waters in connection with the 1986 wall construction; (4) emotional distress damages; and (5) punitive damages. The first three counts sought compensatory damages and attorney's fees and costs in addition to injunctive relief.

Additionally, the complaint included a demand for a jury trial for "all issues triable to a jury as raised by the complaint or other pleadings filed in this action."

The case was tried before a jury. It was submitted to the jury by way of a special verdict form on March 18, 1993. The jury's answers to the first two questions were:

1. Did the Dyers violate Section 10 of the Protective Provisions for Haiku Plantations by changing the grade or drainage of their property before getting the written approval of the Association?

Yes __X__ No _____

If your answer is "YES" to question 1 go to question 2. If your answer is "NO" to question 1 go to question 3.

2. Did the Dyers violation of Section 10 cause damages to the Ingledues?

Yes _____ No __X__

The court did not enter a judgment based on the jury verdict. Upon receiving the verdict, the court stated: "As counsels know, the jury's verdict was an advisory matter to the Court.... Both sides wanted a jury decision on these matters, and I'm inclined to favor and follow what the jury has decided."

Each side claimed prevailing party status and moved for attorney's fees. Although the trial court did comment that it was inclined to award the Dyers prevailing party status, it did not resolve the issue before this appeal was filed.

The court filed its findings of fact, conclusions of law, and decision and order (Order)

on June 24, 1993, finding that the mound was a "technical violation" but that it was "neither intentional nor deliberate, and justifiable. . . ." Further, the court found that there were no "present or prospective damages to [the Ingledues'] property." Hence, the court concluded that the Dyers' "violation of the aforementioned restrictive covenant, by construction of their landscaping mound (without the express authorization of the Board) while their landscaping plans were under consideration, does not warrant issuance of a mandatory injunction." [3]

On July 2, 1993, the court filed its judgment in favor of the Dyers as to all claims.

The Ingledues filed their timely notice of appeal on July 16, 1993.

## II.  DISCUSSION

A.  The Trial Court Did Not Err By Failing To Give Adequate Warning That The Jury Was An Advisory Jury Or By Depriving The Ingledues Of The Right To Trial By Jury

The Ingledues first make two related arguments: first, that the trial court erred by declaring post-trial that the jury was an advisory jury; and second, that the trial court erred by depriving the Ingledues of their right to a jury trial.

In their complaint, the Ingledues sought an injunction compelling the removal of the Dyers' landscaping mound and compensatory and punitive damages allegedly resulting from the mound. The complaint also demanded a jury trial for "any issue triable of right by a jury." After the jury rendered its verdict, the court issued its Order stating that "the Court treats as advisory" the jury's March 18, 1993 special verdict. The Ingledues argue that this was error because the court failed to give prior warning of its intention to treat the jury as an advisory jury.

The Ingledues' first argument, that the court erred by treating the jury verdict as advisory without giving prior notice, must fail. The Ingledues rely upon *Kimball v. Lincoln*, 72 Haw. 117, 809 P.2d 1130 (1991), in which the Hawai'i Supreme Court stated:

> There were issues which were triable, as of right, by a jury, and a general demand having been made for a jury trial, the jury's verdict on those issues cannot be set aside unless not supported by the evidence. *There were also issues which were not triable, as of right, by a jury, but the appellee made no objection to a jury trial of those issues, and indeed appears, tacitly, to have consented thereto,* and the court made no finding that they were not triable by a jury.  Under HRCP 39(a), therefore, all claims at issue when the jury demand was made, were triable by a jury and not by the court.

*Id.* at 129, 809 P.2d at 1136 (emphasis added).

■ Because they made a general jury demand, the Ingledues argue that either the Dyers were required to object, or the court was obligated to make a finding that the equitable issues were not triable by a jury. Because this did not occur, the Ingledues argue, the court could not treat the jury's verdict as advisory. This case differs, however, from *Kimball,* because there was no tacit consent to a jury trial on both the equitable and legal issues. The trial court, the Ingledues, and the Dyers were all apparently in agreement that the jury would be merely advisory with respect to the equitable issues and that the judge would make the decision whether to grant an injunction. The Ingledues' assertion that they were surprised by the trial court's statement, after the jury verdict, that the jury would be advisory to the court, is contradicted by the Ingledues' statement to the court that, "I think the legal rights at stake here will be answered by the jury as an advisory jury to you, and you will then make the equitable relief we are requesting." In addition, this was not the only occasion where the Ingledues indicated their

---

3.  Additionally, the court found and concluded that the 1986 wall construction did not affect the free passage of surface waters and further that the landscaping mound neither unreasonably interfered with the existing surface water flow nor exposed Plaintiffs–Appellants Thomas Charles In-

gledue and Jacquelyne Lucille Ingledue's (the Ingledues) property to an unreasonable risk of harm and thus declined to issue a mandatory injunction based on the Ingledues' second and third theories of recovery.  These findings and conclusions are not challenged by the Ingledues.

understanding that the Court would make the ultimate decision on granting the injunction.[4] The Dyers also understood that the jury would be advisory on the issue of injunctive relief.

Because this case differs from *Kimball*, where there was tacit consent to try all issues before the jury, we do not believe it was error for the court to treat the jury verdict as advisory without making a prior formal announcement or having some objection by the Dyers to the general jury demand.

The Ingledues' second argument, that they were denied the right to a jury trial, must also fail. The appropriate approach, when a general demand for a jury trial is made, and there are both legal and equitable issues involved, was explained in *Association of Apartment Owners (AOAO) of the Magellan v. Sequito*, 6 Haw.App. 284, 719 P.2d 746 (1986). In that case, the AOAO sued the Sequitos asserting an equitable claim (to enjoin baby-sitting activities) and a legal claim (to recover penalty assessments for continuing violations). The Sequitos demanded a jury trial on "all issues." The trial court granted the AOAO's motion to strike the Sequitos' demand (motion), finding that the entire case was of an equitable nature.

On appeal, our court concluded that the Sequitos were entitled to have a jury decide the disputed factual questions involved in the claim for monetary award (the legal claim) and for the trial court to hold off its decision on the request for injunction (the equitable claim) until the jury had decided the disputed factual questions common to both claims.[5]

Note, however, that the jury's verdict would be binding only towards the legal issues. The jury's verdict would be advisory, not conclusive, towards the equitable issues. *See Honolulu Sav. & Loan Co. v. Ing*, 40 Haw. 269, 273 (1953). Hence, we reversed the part of the order granting the motion as to the issues involved in the legal claim and those issues in the equitable claim that were common to the issues in the legal claim. We affirmed the part of the order granting the motion as to the issues in the equitable claim that were not common to the issues in the legal claim and remanded the case for further proceedings.

■ We believe that the trial court in the instant case acted consistently with *Sequito*. The jury was allowed to decide the disputed factual questions that were necessary to the determination of the legal claims. Those questions were: 1) whether the Dyers violated the restrictive covenant by changing the grade or drainage of their property without approval; 2) whether that violation caused damages; 3) whether the Dyers interfered with the flow of surface waters; 4) whether such interference subjected the Ingledues to an unreasonable risk of harm; 5) whether such interference caused damages; and 6) what amount of damages, if any, were suffered.

The first and second questions were common to both the legal and equitable claims. Hence, it was proper for the jury to answer these questions. The court did not allow the jury to decide the purely equitable questions

---

4. On the first day of trial, before *voir dire*, the Ingledues' counsel stated:

   I think that [the Dyers' counsel] actually understands and agrees with me on that. He says, obviously, we will not argue to the jury that it should balance the relative hardships or consider alternative remedies before granting injunctive relief since the claim for injunctive relief will be determined by the court, not the jury. So I think he agrees with me.

   Later in the trial, Ingledue's counsel stated:
   The allegation in Count I that there was a violation of declaration is an allegation of law. That is not an equitable claim. That is a legal claim as Sandstrom [sic] says and the jury is entitled to decide legal issues. So it is the jury that's going to decide whether or not that covenant was violated. Now, yes, the Court

will take that answer and decide on the injunctive relief[.]

5. The federal and Hawai'i rule is as follows:

   The Supreme Court has now made it wholly clear that a claim that would otherwise be triable to a jury must be so tried even though it may be thought "incidental" to a claim for an injunction. The order of trial must be arranged so that any issues common to the legal claim and the claim for an injunction are tried to a jury at the outset, with the court thereafter resolving any purely equitable issues in the case.
   *Association of Apartment Owners of the Magellan v. Sequito*, 6 Haw.App. 284, 288, 719 P.2d 746, 749 (1986) (citing 9 Wright & Miller, *Federal Practice and Procedure: Civil* § 2308 (1971)).

of whether the Dyers "deliberately or intentionally" violated the restrictive covenant or "intentionally took a chance or assumed the risk." This was proper because these questions were not common to the issues involved in the legal claim. Additionally, the jury's answers to questions one and two were treated as advisory with respect to the equitable issues. That decision was also appropriate. Therefore, the trial court did not violate the Ingledues' right to a jury trial because the right to a jury trial extended only to the issues involved in the legal claim.[6]

### B. The Trial Court Did Not Err By Requiring Proof Of Damages To Enforce The Restrictive Covenant

The Ingledues next argue that the trial court erroneously required the Ingledues to prove damages before granting injunctive relief. Although the court never stated that damages must be shown before it would issue an injunction, the Ingledues infer this requirement from the jury instructions, the special verdict form, and the court's Order. We disagree. We do not believe the court maintained any such requirement.

#### 1. Jury Instructions And Special Verdict Form

The Ingledues first point to the jury instructions and special verdict form to support their argument that the court required damages to be shown before it would issue injunctive relief. The jury was instructed that an essential element of the Ingledues' claim for breach of the restrictive covenant was proof by a preponderance of the evidence that the breach "was a legal cause of property damage to the [Ingledues]." On the special verdict form, the jury was asked whether the Dyers' violation of the restrictive covenant caused damages to the Ingledues.

The Ingledues argue that their proposed instruction number 11 should have been given. Their instruction stated:

The right of the Ingledues to enjoin the Dyers' breach of the Declaration of Protec-

tive Provisions does not depend on the existence or the amount of damages the Ingledues have suffered; the Dyers' mere breach is sufficient ground for injunctive relief. In the case of restrictive covenants on the use of real property, the Ingledues do not need to show irreparable harm to obtain an injunction.

■ Because the court rejected this proposed instruction, allowed an instruction that required damages, and asked about damages on the special verdict form, the Ingledues presume that the court was conditioning injunctive relief upon a showing of damages. This is incorrect. As discussed in the preceding section, the jury was to decide all of the factual questions relevant to the legal claim, including those that happen to be common to the equitable claim. The jury was not to decide questions that went only toward the equitable claim. See Mathewson v. Aloha Airlines, Inc., 82 Hawai'i 57, 79 n. 22, 919 P.2d 969, 991 n. 22 (1996) ("[I]n a jury trial of an action seeking equitable and legal remedies the jury decides legal questions and awards legal damages and the court decides equitable questions and awards equitable relief."). Issuance of an injunction is considered equitable relief. The Ingledues' proposed instruction dealt with a purely equitable issue, while the accepted instruction dealt with a legal issue.

■ "When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." Craft v. Peebles, 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995) (internal quotation marks and citations omitted). Further, "[i]n analyzing alleged errors in special verdict forms, the instructions and the interrogatories on the verdict form are considered as a whole." See Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 383–84, 742 P.2d 377, 382–83 (1987) ("[T]he judge should explain the law of the case, point out the essentials to be proved on one side or the

---

**6.** As a practical matter, in cases involving both equitable and legal issues, we encourage practitioners to make an express declaration if they wish to have all of the issues decided by the jury. This declaration should be made before any evidence is presented. If the opposing party and the judge agree, then the jury's decision will be binding on all issues.

other, and bring into view the relation of the particular evidence adduced to the particular issues involved. And all of this must be done in such a manner that the jury will not be misled.") (citations, internal quotation marks, and brackets omitted). *Montalvo v. Lapez,* 77 Hawai'i 282, 292, 884 P.2d 345, 355, *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

The court did not err in the instant case because the jury's function was to determine the legal issue of whether the Dyers committed a breach of a restrictive covenant and whether that breach warranted compensatory damages. Hence, it was appropriate for the jury to be instructed that the Ingledues must prove damages for the Ingledues to recover. Additionally, it was proper that the special verdict form asked whether the Dyers' violation caused damages to the Ingledues. It was *not* the job of the jury to determine the equitable issue of whether an injunction should be issued as a result of any violation. That duty was properly left to the judge. Therefore, we conclude that the court did not err because the jury instructions and special verdict form were not prejudicially insufficient, erroneous, inconsistent, or misleading.

### 2. *The Trial Court's Order*

The Ingledues also point to the court's order to support their argument that the court required damages to be shown before it would issue injunctive relief. It is true that the court found that "the [Ingledues] were not harmed by the construction of the mound." It is also true that this was one of the factors mentioned as a reason for denying injunctive relief. However, the court mentions several other factors that it considered in denying relief.[7] Further, the court never stated that damages were a prerequisite to the issuance of injunctive relief. In

fact, there is no support in the record or in the court's rulings for the Ingledues' contention that the court considered damages to be a necessary element of injunctive relief. Therefore, we conclude that this argument has no merit.

### C. *The Trial Court Did Not Err By Failing To Consider Whether The Violation Was Of The Risk–Taking Variety*

The Ingledues finally argue that the trial court erred by refusing to recognize the Ingledues' right to injunctive relief if the violation of the restrictive covenant was of the "risk-taking variety." We disagree because we believe the instant case is distinguishable from *Sandstrom v. Larsen,* 59 Haw. 491, 583 P.2d 971 (1978), where the "risk-taking" rule was introduced.

■ We begin with the proposition that the grant or denial of equitable relief is a matter "addressed to the sound discretion of the trial court and its decision will not be set aside unless manifestly against the clear weight of the evidence." *Jenkins v. Wise,* 58 Haw. 592, 598, 574 P.2d 1337, 1342 (1978).

The Ingledues argue that the court failed to follow the rule adopted in *Sandstrom,* where the Hawai'i Supreme Court stated: "We are convinced that where a property owner deliberately and intentionally violates a valid express restriction running with the land or intentionally takes a chance, the appropriate remedy is a mandatory injunction to eradicate the violation." *Id.* at 500, 583 P.2d at 978 (emphasis, internal quotation marks, and citation omitted). Our court reiterated this proposition in *Pelosi v. Wailea Ranch Estates,* 10 Haw.App. 424, 444, 876 P.2d 1320, 1330, *reconsideration denied,* 879 P.2d 591, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994).

---

**7.** The court stated in it's Findings of Fact, Conclusions of Law, and Decision and Order that: The defendants in *Sandstrom,* unlike defendants in this case: (a) constructed their improvement without any expectation that it was allowable (if approved by some designated body); (b) had no justification or authority to proceed with construction of their improvement (such as the authorization given by the Association in our case); and (c) did not merely assume the risk of removal if the improvement was not subsequently approved by a body vested with that authority (such as the Association in our case), but instead ran the risk that their deliberate and knowing violation of the covenant would foreclose any consideration of the supposed "hardship" that would result from its enforcement.

■ The Ingledues argue that the trial court focused solely on the deliberate and intentional conduct prong in *Sandstrom* and ignored the "take a chance" prong. It is true that the court stated in its Order that the violation "(a) did not result in any present or prospective damages to plaintiff's property; and (b) was neither deliberate nor intentional." However, the trial court took pains in the Order to distinguish the case from *Sandstrom*.[8] The question of whether the trial court was correct in distinguishing the cases is a legal question that is freely reviewable on appeal under the right/wrong standard. We believe the court was right in differentiating the instant case from *Sandstrom* and further, that it was within the court's discretion whether or not to issue an injunction.

The two meaningful differences between the instant case and *Sandstrom* and *Pelosi* are in the nature of the applicable restrictive covenant and the status of the violation at the time of judgment. In *Sandstrom* and *Pelosi*, the restrictive covenants absolutely prohibited the offending structures. In the instant case, the restrictive covenant barred improvements that effectuated a "change in grade," yet allowed for construction of such improvements upon receipt of written approval from the Association.

The second major difference is the status of the violation at the time of judgment. In the instant case, approval of the landscaping plan was received,[9] and the violation resulting from the mound no longer existed when the lower court was asked to rule on the injunction to remove the mound. "Since equity speaks at the time of the decree," *Kress v. West Side Tennis Club*, 57 Misc.2d 772, 775, 293 N.Y.S.2d 666, 669 (1968), injunctive relief was not an appropriate remedy. By contrast, in *Sandstrom* and *Pelosi* there was no belated approval or possibility of belated approval. Hence, the violations would have continued indefinitely unless injunctive relief was granted.

The *Sandstrom* court concluded that "the appropriate remedy is a mandatory injunc-

tion to eradicate the violation." *Sandstrom*, 59 Haw. at 500, 583 P.2d at 978. In the instant case, there was no longer a violation to eradicate. Any harm caused by the previous violation could have been cured by legal damages. Since the Ingledues asked for compensatory damages and the jury found that they suffered none, we believe the Ingledues received all they were entitled to.

In view of the distinctions between the instant case and *Sandstrom* and *Pelosi*, and having reviewed the court's careful consideration of the circumstances, we conclude that the court did not abuse its discretion by denying equitable relief.

### III. CONCLUSION

For the reasons discussed above, we affirm the July 2, 1993 judgment.

scaping plan, which included the mound and the trench.