LYNN HAWKINS, Plaintiff-Appellee/Cross-Appellant,
v.
WAIKOLOA VILLAGE ASSOCIATION, Defendant-Appellant/Cross-Appellee, and
JOHN MAURO, JOHN DOES 1-10, JANE DOES 1-10, and
DOE PARTNERSHIPS, CORPORATIONS, GOVERNMENTAL UNITS, or OTHER ENTITIES 1-10, Defendants
No. 26626.
Intermediate Court of Appeals of Hawaii.
February 5, 2008.
On the briefs
Larry C.Y. Lee, for defendant-appellant/cross-appellee.
David W. Lacy and Kimberly A. Jackson, (Lacy & Jackson) for plaintiff-appellee/cross-appellant.

MEMORANDUM OPINION
RECKTENWALD, C.J., WATANABE, and FOLEY, JJ.
This appeal and cross-appeal from an Amended Final Judgment entered by the Circuit Court of the Third Circuit[1] (the circuit court) on June 3, 2004 stem from:
(1) a lawsuit filed by Plaintiff-Appellee/Cross-Appellant Lynn Hawkins (Hawkins) against Defendant-Appellant/Cross-Appellee Waikoloa Village Association (WVA or Association) and Defendant John Mauro (Mauro) (WVA and Mauro hereinafter collectively, Defendants) seeking damages for an alleged breach of contract (Count I) and a mandatory injunction directing Defendants to restore Hawkins's golf privileges at the Waikoloa Village Golf Course (Golf Course) (Count II); and
(2) a counterclaim filed by Defendants against Hawkins seeking: (a) injunctive relief to restrict "Hawkins'[s] dangerous and tortious conduct together with an award of costs and reasonable attorneys' fees" (Count 1), (b) damages for Hawkins's alleged assault of Mauro (Count 2), (c) damages for Hawkins's alleged conversion of WVA's property (Count 3), and (d) damages for Hawkins's alleged intentional interference with WVA's existing and/or prospective business advantage (Count 4).
As to Count I of Hawkins's complaint against WVA, the Amended Final Judgment awarded Hawkins $4,928.00 in damages for breach of contract, based en a conclusion that the WVA Board of Directors (WVA Board) had violated Section 7C(iv)(b) of WVA's Declaration of Protective Covenants (Declaration) by failing to declare Hawkins in continuing violation of the provisions of the Declaration and provide Hawkins with a hearing prior to suspending his golf privileges. The Amended Final Judgment also awarded Hawkins $98,150.00 in attorneys' fees and $7,619.67 in costs, based on a conclusion that Ha was Failings party and was entitled to attorneys' fees and costs pursuant to Hawaii Revised Statutes (HRS) § 421J-10(b) (2004).[2] HRS chapter 421J regulates planned community associations. Additionally, the Amended Final Judgment dismissed Count I of the complaint as to Mauro and Count II of the complaint as to Defendants.
As to Defendants' counterclaim, the Amended Final Judgment awarded WVA $1,250.00 in damages on Count 3 for Hawkins's conversion of golf balls and dismissed Counts 1, 2, and 4.
The Amended Final Judgment entered judgment in favor of Hawkins and against WVA for a total amount, offset by the counterclaim award, of $109,447.67.
On appeal, WVA argues that the circuit court erred as a matter of law in:
(1) finding that WVA breached Section 7C(iv) of the Declaration and that Section 7C(iv) applied to Hawkins's Behavior 1 (Hitting Balls from Home), Behavior 3 (No Reservation/ Check In), Behavior 4 (Taking Course Balls), Behavior 5 (Selling Equipment/Lessons), Behavior 6 (Hitting Range Picker), Behavior 7 (Taking Lucky Stone), Behavior 8 (Harassing Course Designer), and Behavior 10 (Harassing Director);
(2) applying Hawaii Rules of Evidence Rule 615 to exclude from a portion of the trial Philip Conceicao, a WVA director who had been designated as WVA's representative, thereby denying WVA its due-process rights and right to a fair trial;
(3) awarding Hawkins attorneys' fees and costs pursuant to HRS § 421J-10(b) since Hawkins did not prevail on any count for enforcement of any provision of WVA's Declaration, by-laws, house rules, or HRS chapter 514A;
(4) denying WVA's motion for a new trial and disqualification of Hawkins's counsel, which was filed on grounds that Hawkins's counsel had engaged in ex parte communications with four representatives of WVA, in violation of Hawai'i Rules of Professional Conduct Rule 4.2;
(5) denying WVA's motion to compel the production of documents relating to "unethical contacts with WVA directors and officers" by Hawkins's counsel;
(6) not reducing Hawkins's damages award of $4,928.00 by the $1,150.00 in annual golf fees that WVA refunded/reduced during Hawkins's suspension period;
(7) concluding that WVA is an association of apartment owners and Hawkins is an aggrieved apartment owner, pursuant to HRS § 514A-88 (1993);
(8) concluding that the "advice of counsel" defense did not apply in this case;
(9) concluding that the "business judgment rule" did not apply in this case;
(10) not limiting Hawkins's damages to the thirty-day period Hawkins was given to request a hearing or, alternatively, up to the commencement of mediation on September 22, 1999 because Hawkins failed to mitigate his damages; and
(11) finding that Hawkins mediated in good faith. In his cross-appeal, Hawkins argues that the circuit court erred when it failed to:
(1) award him pre-judgment interest;
(2) award him post-judgment attorneys' fees and costs;
(3) enter the Amended Final Judgment nunc pro tunc to the time the Final Judgment was filed; and
(4) award him general damages.
We agree with WVA's first, third, and seventh points on appeal and, accordingly, we: (1) reverse in part and affirm in part the Amended Final Judgment, and (2) vacate several conclusions of law entered by the circuit court.

BACKGROUND

A.
Waikoloa Village (alternatively, Development) is a planned community on the island of Hawai`i. HRS § 421J-2 (2004)[3] defines "planned community" as
a common interest community, other than a condominium or a cooperative housing corporation or a time share plan, which includes all of the following characteristics:
(1) Real property subject to a recorded declaration placing restrictions and obligations on the owners of the real property and providing for rights and responsibilities of a separate entity, the association:
(A) Which owns and maintains certain property within the planned community for the common use or benefit, or both, of the owners of units within the planned community;
(B) Which is obligated to maintain certain property it does not own within the planned community for the common use or benefit, or both, of the owners of units within the planned community; or
(C) Which is obligated to provide services to any such owners or units;
(2) Individual owners own separate units which are part of a planned community at least some of which are improved by or are to be improved by residential dwellings;
(3) Owners have automatic and non-severable membership in an association by virtue of ownership of units within the planned community; and
(4) Owners, other than a master developer or a clarant, are obligated to pay mandatory assessments by virtue of ownership of a unit within the planned community.
"[A]ll of the lots and parcels located within" Waikoloa Village are subject to the Declaration that was executed on May 27, 1971 by and between developer Boise Cascade Home & Land Corporation (Declarant) and First Hawaiian Bank (Trustee), which held the legal title to the real property subject to the Declaration.[4] The Declaration, which was recorded on June 2, 1971 in the Bureau of Conveyances, includes provisions applicable to residential lots[5] and common areas (Common Areas) in Waikoloa Village that "operate as covenants running with the land for the benefit of each and all other lots and parcels in the Development and their respective owners." These provisions were adopted "in furtherance of a plan for the development, improvement and sale of said lots and parcels, and [we]re established for the purpose of enhancing and protecting the value, desirability and attractiveness of the Development as a whole and each of said lots and parcels situated therein."
The Declaration establishes WVA as a not-for-profit corporation and provides that "[e]very Owner of a Residential Lot shall be a Member of the Association." According to the Declaration,
[t]he purpose of [WVA] is to promote the common interests of the Members and to operate, maintain, repair and replace the Common Areas, and it shall have all necessary or appropriate powers to accomplish the same including, without limitation, the power to promulgate and enforce rules and regulations covering the use and enjoyment of the Common Areas, to charge reasonable fees for such use and to contract with others for the operation, maintenance or repair thereof, or for the use and enjoyment thereof in common with and on not more favorable terms than the Memmbes, and to enforce the provisions of this Declaration.
With respect to the Common Areas of Waikoloa Village, the Declaration provides, in pertinent part, that
[a]ll. Common Areas are private property and shall remain private property. Declarant's or Trustee's recording of the Plat shall not be construed as a dedication to the public of any of the Common Areas. A license upon such terms and conditions as the Association shall from time to time specify for the use or enjoyment of each of the Common Areas is granted to the persons who are from time to time Members of the Association, subject to easements that may exist or be granted from time to time.
The Declaration defines "Common Area" as
all of the real property designated as such in the Supplemental Declaration and all real property acquired by the Association, whether acquired from Declarant or otherwise, together, in each instance, with all improvements which may be constructed thereon, including, but not limited to recreational and community facilities, lakes, parks and streets, but excepting and excluding all easements, rights and interests set forth herein or in the Supplemental Declaration, or reserved or imposed at the time of acquisition by the Association, together with all improvements made in connection therewith.
The Supplemental Declaration is not included in the record on appeal, and it is not clear what Common Areas are subject to the Declaration or whether the Golf Course is a Common Area subject to the Declaration. The transcripts of the proceedings below suggest that the Golf Course may not be subject to the Declaration, since witnesses testified that the Golf Course is used by members of WVA as well as the general public, and depends for its financial existence on a mix of golfers that includes tourists, Hawai`i residents, and Waikoloa Village property owners. See Testimony of Raymond George Foat, November 28, 2000 Transcript of Proceedings, at 55; Testimony of Marty Maas, May 25, 2001 Transcript of Proceedings, at 8. However, the parties have not questioned that the Golf Course is a Common Area as defined by the Declaration.

B.
Hawkins owns a home in Waikoloa Village and has been a member of WVA since 1983.
Mauro was, at all times relevant to this lawsuit, the golf professional and Manager of Golf Course Operations for the Golf Course. When he first assumed the position in September 1995, the Golf Course was in poor condition, both physically and financially. The record indicates that Mauro streamlined operations, increased revenues from golfers and the sale of merchandise, and improved fiscal controls and financial management of the Golf Course. In the process, he made changes to Golf Course operations that displeased Hawkins.
On August 9, 1999, Mauro, with the approval of the WVA Board, sent a letter to Hawkins that suspended Hawkins's golf privileges at the Golf Course, effective the date of the letter, for a period of one year. The letter explained:
Your privileges for use of the Golf Course have been suspended as a result of your long and troubled history of Rules violations at the Golf Course and interference with Golf Course operations as outlined below:
1. On April 14, 1997, you hit golf balls from your residence, across the street and into the Golf Course and almost struck a Golf Course employee thereby putting that employee at risk of severe injury;
2. On July 16, 1997, you threatened to kill me.
3. On October 27, 1997, you initiated play en the Golf Course without checking in as required under the Course Rules. When approached about this matter, you threatened to physically assault me;
4. Again, on October 30, 1997, you once again initiated play on the Golf Course without checking in, in violation of the Course Rules;
5. On October 13, 1997, you were caught stealing golf balls from Golf Course property using a rake ball retriever;
6. Beginning in 1997, you [sic] have used Golf Course property (the driving range) to sell equipment in competition with the Golf Course without permission or authority of the Golf Course;
7. Again, on March 30, 1998, you had to be advised that you were required, under the Golf Course Rules, to check in prior to playing golf;
8. On April 16, 1998, you once again refused to check in and you were advised in writing that future breaches of the Golf Course Rules might result in a suspension of your Golf Course privileges;
9. On November 3, 1998, you were observed absconding with a Golf Course range basket filled with Golf Course owned golf balls;
10. On April 14, 1999, you intentionally hit balls and struck a range picker being operated by a Golf Course employee. When asked to stop, you once again struck the range picker with a golf ball intentionally in an effort to harass the employee;
11. On April 14, 1999, you were observed removing the "lucky" stone from the rock wall on the No. 7 tee and placing the same into your golf bag. A police report was made regarding the matter.
12. In July, 1999, it came to my attention that you had repeatedly contacted the architect and designer of the Golf Course, Robert Trent Jones, Jr. and you have interfered with the ongoing relationship between the Golf Course and Robert Trent Jones, Jr.;
13. Again in July, 1999, you disparaged the Golf Course to one of its major supporters for the Waikoloa Open and thereby endangered an ongoing business relationship.
14. On July 15, 1999, you used your golf cart to harass and intimidate one of the members of the [WVA Board];
15. On July 21, 1999, you refused to play in a scheduled foursome as required under the Golf Course Rules. When assigned to a foursome, you harassed and intimidated the Golf Course staff.
(Emphases in original.) The letter also informed Hawkins that he would be refunded the prorated amount of his prepaid Golf Course membership fees within fifteen days. The letter closed by stating:
Should you wish to appeal this decision, please prepare and submit a written appeal of this decision to the [WVA Board] within thirty (30) days of the date of this letter. Upon appeal, you will be provided a full opportunity to be heard by the [WVA Board].
We regret to have to take this action, but your conduct on the Golf Course has not only put others in danger, it has injured the Golf Course and its operations. Although you have been provided several opportunities to reform your conduct to comply with the applicable Rules and Regulations, you have failed to do so and left the Golf Course no choice but to suspend your membership.
Hawkins did not appeal his suspension to the WVA Board and instead requested mediation of the dispute. When mediation failed, he filed the underlying complaint against Defendants.
On April 11, 2003, following a bench trial, the circuit court entered "Amended Findings of Fact and Conclusions of Law; Order" that Hawkins was entitled to judgment against WVA for $109,447.67. The circuit court's Amended Findings of Fact, which neither party has disputed, provides, relevant to this appeal and cross-appeal:

FINDINGS OF FACT
. . . .

B. Causes of Action
4. By letter dated August 9, 1999 from [Mauro,] [Hawkins] was notified that his golf privileges at [the Golf Course] were suspended for a period of one (1) year as a result of 15 alleged incidents. Therein, [Mauro] offered [Hawkins] a full opportunity to be heard by the [WVA Board] upon appeal within thirty (30) days of the date of the letter. [Mauro's] Exhibit 130. [Hawkins's] claims arise from this suspension and include allegations that he is entitled to damages from [WVA] because he is an aggrieved apartment owner under [HRS] Section 514A-88. [Hawkins] contends that [WVA] failed to comply with its own bylaws.
5. Section 16 cf the Bylaws give]]]s the WVA Board] and/or its managers the power to suspend Association members without limitation:
The property, business and affairs of the Association shall be controlled by the Board of Directors, which shall have and may exercise all of the powers of the Association, including, without limitation, all of the powers of the Association as set forth in the Declaration of Protective Covenants, except such as ere expressly reserved to or may from time to time be conferred upon the members by law, the Charter of Incorporation, the Declaration, or these Bylaws. (Emphasis added).
6. Pursuant to 7C(iv) of the Declaration of. Protective Covenants, the [WVA Board] may suspend a [WVA] member's right to use Common Areas for:
(a) Any period during which any Association charge remains unpaid; and
(b) Any period of continuing violation of the provisions of this Declaration after the existence thereof shall have been declared by the Board and the Member has been given a reasonable opportunity to be heard by the Board. ([Hawkins's] Exhibit Al). [Emphasis added]
7. Waikoloa Village Golf Club Guidelines were prepared by [G]olf [C]ourse manager, [Mauro], at the instruction of the [WVA Board]. Exhibit 131.
8. The disputes between [Hawkins] and [D]efendants began after [WVA] hired [Mauro] in 1997. Prior to that time, the manager and golf pro was Charles Rogosheske. When Mr. Rogosheske was the golf pro, [Hawkins] had been allowed to:
a. "Walk for free"; if there was no need to pay a fee and no need for a cart, [Hawkins] could golf without having to check in at the pro shop;
b. Retrieve golf balls from the water hazard;
c. Golf at specific times set aside for him and his friends ("standing tee time");
d. Golf with whomever he chose; and
e. Provide informal golf lessons.
9. When [Mauro] became the manager/golf pro for [WVA], things changed. Defendants believe that [Hawkins] violated the rules, Golf Guidelines and standard acceptable golf course behavior and etiquette, by engaging in the following:
a. On 4/12/97 and other times, hitting golf balls from his residence, across Paniclo [S]treet and into the [G]olf [C]ourse. This behavior endangered the health and well-being of [G]olf [C]ourse employees. (Exh. 101, 102, 104 & 234; Testimony of Mauro, Mallory, Libcrio.)
b. Threatening to kill Mauro on 7/16/97, because [Hawkins] was upset with the way the golfer, with whom he was paired, drove the golf cart. (Exhs. 102, 149; Testimony of Mauro.)
c. Failing and refusing to check-in [sic] prior to playing golf. (Exh. 104) [Hawkins] was aware of the requirement to check-in [sic] prior to playing golf and intentionally violated the requirement.
d. Wrongfully taken [sic] [G]olf [C]ourse property from the course. For example, [Hawkins] has been taking golf balls out of the No. 3 pond with a "rake" retriever, even though asked to stop. (Exh. 104, 131 & 234; Testimony of Mauro, Mallory and [Hawkins].) On 11/3/98, [Hawkins] took a range basket of golf balls belonging to the [G]olf [C]ourse. (Exh. 113 & 234; Testimony of Mauro.) On 7/23/99, [Hawkins] was seen taking range balls from the driving range. (Exh. 144)
e. From 1997, [Hawkins] has used the [G]olf [C]ourse (driving range) to sell equipment in competition with the pro shop, without permission. (Exh. 104 & 234; Testimony of Mauro.)
e. [sic] Used the [G]olf [C]ourse to give private golf lessons without permission. This behavior exposed the [G]olf [C]ourse and the Association to potential liability, as well as, wrongfully competed with the operations of the [G]olf [C]ourse. (Testimony of Mauro)
g. On 4/14/99, [Hawkins] intentionally hit balls and struck the range picker, even after the range picker employee had asked [Hawkins] to stop. (Exh. 117 & 234; Testimony of Mauro.)
h. On 4/14/99, [Hawkins] wrongfully took the "Lucky Stone" from the rock wall on the No. 7 tee and [G]olf [C]ourse. (Exh. 119, 120 & 234; Testimony of Mallory, Mauro)
In July 1999, [Hawkins] had repeatedly contacted the architect and designer of the course, Robert Trent Jones, and thereby interfered and jeopardized the ongoing business relationship between the [Golf Course] and Robert Trent Jones. (Exh. 122, 123, 124 & H; Testimony of Mauro, Conceicao.)
J. In July 1999, [Hawkins] disparaged the [G]olf [C]ourse to Mr. Charles Park, General Manager of Mauna Kea Resort, one of the [G]olf [C]ourse's major supporters for the Waikoloa Open and thereby interfered with and endangered an ongoing business relationship. (Exh. 125; Testimony of Mauro.)
k. On 7/15/99, [Hawkins] used his remote control golf cart (not riding cart) to harass and intimidate one of the board members playing golf. (Exh. 126 and 234; Testimony of Foat, Mauro)
l. On 7/21/99,. [Hawkins refused to play in a scheduled foursome as required under the Golf Course Rules. When [Hawkins] was assigned to a foursome, he harassed and intimidated the staff. (Exh. 127, 128, 131 & 234; Testimony of Mauro.)
m. In July 1999, [Hawkins] hit into a group of golfers ahead of him and complained that the group was playing too slowly. (Exh. 125; Testimony of Mauro)
n. Refused to be paired with other golfers, in contradiction to the golf guidelines and standard [G]olf [C]ourse policy. (Exh. 127, 140; [T]estimony of Groves)
o. Failed to make tee reservations and demanded that the noon hour be automatically reserved for him and his "noon group." (Exh. 116) This Practice has resulted in inconvenience to the [G]olf [C]ourse and to other golfers and has resulted in loss [sic] revenues to the [G]olf [C]ourse. (Testimony of Mauro, Rose)
10. Considering the credible evidence, the court finds that [Hawkins]:
a. Removed at least 850 golf balls from one or more water hazards located on the [G]olf [C]ourse. Exhibits 59A-59G; [T]ranscript of [P]roceedings 12/19/00, p. 33, lines 7-18. The total value of the golf balls removed was $1,250.00. Transcript of [P]roceedings 4/25/01[; T]estimony of [Mauro].
b. Removed the lucky stone on or about April 19, 1999 but put it back the same day. Testimony of [Hawkins] on December 19, 2000.
c. Sold golf clubs to [G]olf [C]ourse users in competition with the pro shop, without permission. Testimony of Bruce Mallory on, December 19, 2000.
d. Hit golf balls from his house across the street, and onto a vacant lot that is adjacent to the [G]olf [C]ourse for the past 10 years; balls may have gone onto the [G]olf [C]ourse. (Exh. 20; testimony of [Hawkins])
e. During [Mauro's] tenure as [G]olf [C]ourse manager in 1997 until August 9, 1999, [Hawkins] harassed [WVA] by writing to the designer of the [G]olf [C]ourse for the purpose of disparaging [WVA], striking the range picker with golf balls, and running his remote control cart onto the green while [G]olf [C]ourse users were teeing off.
11. Prior to [Mauro's] letter 9, he had advised [Hawkins] in previous correspondences that [Hawkins] was in violation of the rules and regulations governing the use of the [G]olf [C]ourse and threatened the possibility of suspension of privileges. A letter dated March 30, 1998, informed [Hawkins] that he was required to check in prior to playing golf at [the Golf Course] (Defendants['] Exhibit 111) and a letter dated April 16, 1998, again reminded [Hawkins] that he was required to check in prior to playing golf at [the Golf Course]. (Defendants['] Exhibit 108).
12. Prior to the suspension, [Hawkins] complained continuously and vehemently to [WVA]. Among the communications that [Hawkins] wrote to [WVA] was a letter dated April 28, 1998 to Jack Schultz, then president of [WVA], in which [Hawkins] responded to [Mauro's] April 16, 1998 letter and also pointed out to Mr. Schultz that [Mauro] and [WVA] had violated another owner's rights by barring him from the [G]olf [C]ourse. [Hawkins's] Exhibit 25.
13. In addition, [Hawkins] attended [WVA Board] meetings regularly between Summer 1997 and August 1999. [Hawkins] was never given any notice that the WVA Board was considering suspension of his privileges; he never attended any meeting in which he was given an opportunity to challenge, oppose or even discuss the suspension.
14. The [WVA Board] met in executive session on July 27, 1999 to discuss [WVA's] counsel's recommendations concerning suspending [Hawkins's] golf privileges. There is no reliable and credible evidence of what occurred at that meeting because:
a. There are three sets of minutes for that meeting that are inconsistent with each other; two of which indicate that, of the six directors present at the meeting there were four votes, including Megan Kaaihili's, to suspend [Hawkins's] golf privileges ([Hawkins's] Exhibits A83 and A84), and one set of minutes which indicates three votes to suspend [Hawkins's] golf privileges ([Hawkins's] Exhibit A90) with Megan Kaaihili voting against suspending [Hawkins's] golf privileges;
b. Megan Kaaihili, the secretary who prepared the minutes, testified that Exhibits A83 and A84 were mistakenly prepared the night of the meeting when she was upset (p. 21-23 of November 27, 2000 transcript), and that [Hawkins's] Exhibit A90, prepared the day after the meeting, reflects her accurate vote;
c. [WVA] Vice-President Paula Kamiya testified that Megan Kaaihili voted against suspension of [Hawkins's] privileges (p. 56 of November 27, 2000 transcript), and [WVA] Director Phil Conceicao testified that Megan Kaaihili voted for suspension (p. 94 of April 26, 2001 transcript);
d. [WVA] Director Fred Ornellas testified both that he was not sure whether he voted to suspend [Hawkins's] golf privileges (p. 9 of November 27, 2000 transcript), and that he voted for [Hawkins's] one year suspension (p. 49 of November 27, 2000 transcript); and
e. The minutes do not indicate exactly what suspension, the [WVA] Board at the July 27, 1999 meeting, if any, voted on.
15. [The WVA Board] failed to properly declare any violation of its Declaration as required by 7C(iv)(b) of the Declaration of Protective Covenants.
16. The [WVA] Board authorized and instructed [Mauro], as the golf professional and [G]olf [C]ourse manager, to sign a suspension letter to [Hawkins] that was prepared by general counsel and the [WVA] Board. [Mauro] signed the suspension letter on August 9, 1999. (Exh. 130; testimony of Mauro, Conceicao)
17. [Hawkins] was effectively suspended from playing golf at the [G]olf [C]ourse for one year from August 9, 1999.
18. As a result of the suspension, the Association refunded [Hawkins] $400[.00] in prepaid fees for 1999. Also, because of the suspension until 8/9/00, [Hawkins's] prepaid fees for the rest of 2000 was [sic] reduced by $750[.00]. (Testimony of Mauro, [Hawkins])
19. As a result of the suspension, [Hawkins] was forced to go to other golf courses to play, with the attendant fees and travel costs as follows:
a. $3,435[.00] for golf fees over and above what [Hawkins] would have spent at [the Golf Course] ([Hawkins's] Exhibit A31); and
b. $1,493[.00] in travel costs computed at $.35 per mile ([Hawkins's] Exhibit A31).
20. As a result of the suspension, [Hawkins] incurred attorneys' fees of $98,150.00 and costs in the amount of $7,619.67. Affidavit of Stephen D. Whittaker, filed June 6, 2001.
21. [Hawkins] submitted this dispute to mediation and attended the mediation with full authority to settle the dispute. Notwithstanding representations to [Hawkins] that [WVA] would send two or more Board members and its legal counsel to mediation ([Hawkins's] Exhibit A35), [WVA] sent only one director and its attorney to the mediation without full authority to settle the dispute (p. 127 of the April 26, 2001 transcript). The mediation went forward nevertheless and ended because the parties reached an impasse on the issue of attorney's [sic] fees and costs. The Court finds that all parties attempted to resolve this dispute in good faith prior to trial.
17. [sic] An offer of settlement in the amount of $1,000[.00], made pursuant to Rule 68 of the Hawaii Rules of Civil Procedure and directed to the Counterclaim only, was made by [Hawkins] and filed on September 21, 2000.
(Emphases in original.)
The circuit court's Amended Conclusions of Law provided, in relevant part:
CONCLUSIONS OF LAW
. . . .
23. Pursuant to 7C(iv) of the Declaration of Protective Covenants, [WVA] must declare continuing violations and give its' [sic] members a reasonable opportunity to be heard before suspending a member's right to use common areas.
24. In direct contravention of its Declaration of Protective Covenants, [the WVA Board] never declared the existence of [a] continuing violation of the provisions of the Declaration of Protective Covenants by [Hawkins].
25. In direct contravention of its Declaration of Protective Covenants, [Hawkins] was given no opportunity to be heard by [the WVA Board] before he was suspended on August 9, 1999.
26. HRS Section 514A-88 mandates strict compliance with covenants and bylaws of associations of apartment owners, which states in pertinent part:
Each apartment owner, tenants and employees of an owner, and other persons using the property shall comply strictly with the bylaws and with the administrative rules and regulations adopted pursuant thereto. . . [.] Failure to comply with any of the same shall be ground for an action to recover sums due, for damages or injunctive relief, or both, maintainable by . . . an aggrieved apartment owner.
27. [WVA] is an association of apartment owners and [Hawkins] is an aggrieved apartment owner under HRS Section 514-88.
28. Neither advice of counsel or the business judgment rule excuses [WVA] from [the WVA Board's] clear violations of its Declaration of Protective Covenants and/or Bylaws and HRS Section 514-88.
29. Defendants' offer to give [Hawkins] an opportunity to be heard on appeal of [Mauro's] August 9, 1999 letter, is a post-suspension procedure and is not equivalent to a right to be heard before a suspension.
30. Damages sustained by [Hawkins] as a result of the unlawful suspension by [WVA] equals $4,928.00. [WVA's] refund of $1,150[.00] does not reduce the damages owed to [Hawkins] because [Hawkins] did not have the benefit of the use of the [G]olf [C]ourse during the refunded periods.
31. [WVA] and [Hawkins] participated in mediation prior to the initiation of this lawsuit and have thus complied with the requirements to do so under HRS Section 421J-13.
32. [WVA's] counterclaim for injunctive relief is denied as [WVA] is not entitled to said relief. [Hawkins] had already served a one year suspension by the time of trial; pursuant to the August 9, 1999 letter.
33. [WVA's] counterclaim for conversion has been proven by a preponderance of the evidence. Damages sustained by [WVA] as result [sic] of [Hawkins's] illegal taking of golf balls equals $1,250.00.
34. [Hawkins] is the prevailing party herein and entitled to be reimbursed for reasonable and necessary expenses, costs and attorneys' fees and costs pursuant to HRS [8] 4213-10(b). To wit:
If any member is the prevailing party in any action against an association, any of its officers or directors, or its board of directors to enforce any provision of the association documents or this chapter, then all reasonable and necessary expenses, costs, and attorneys' fees incurred by the member shall be awarded to the member; provided that no such award shall be made in any derivative action . . .
35. The trial of this case took seven court days spanning November 2000 to May 2001, and included the testimonies of thirteen witnesses and the receipt of dozens of exhibits. Considering the contentiousness of this case, the issues, the length and complexity of trial, and after reviewing the detailed breakdown of fees and costs attested to by [Hawkins's] counsel, this court finds that all of the fees and costs incurred by [Hawkins] through June 6, 2001 are reasonable. Therefore, [WVA] shall pay [Hawkins's] attorneys' fees of $98,150.00 and costs in the amount of $7,619.67.
36. After considering all of the facts and the law and the circumstances herein, [Hawkins] is not entitled to recover prejudgment interest on his damage award, under H.R.S. Section 636-16.
(Emphases and some ellipses in original.)
On April 21, 2003, the circuit court entered a Final Judgment in favor of Hawkins and against WVA in the amount of $109,447.67. On May 1, 2003, WVA filed a "Motion to Alter or Amend Judgment and for New Trial, to Compel the Production of Documents by [Hawkins] and for the Disqualification of [Hawkins's] Counsel[,]" which the circuit court denied by an order entered on August 20, 2003. On September 10, 2003, WVA filed a Notice of Appeal from the Final Judgment.
On January 7, 2004, the Hawai`i Supreme Court entered an order dismissing WVA's appeal for lack of appellate jurisdiction, concluding that the Final Judgment did not "resolve all of [Hawkins's] claims and all of [WVA's] counterclaims, as required by Jenkins v. Cades Schutte Fleming & Wright, 76 Hawai`i 115, 119-20, 869 P.2d 1334, 1339-39 (1994)[,]" and that the appeal was therefore premature.
On June 3, 2004, the circuit court entered the Amended Final Judgment that prompted this appeal and cross-appeal.

DISCUSSION

A. Section 7C(iv) of the Declaration Did Not Apply to Hawkins's Conduct.
Section 7C of the Declaration provides, in pertinent part:
7. THE ASSOCIATION.
. . . .
C. Powers. In addition to all its other powers, the Association may levy a uniform annual charge against each Residential Lot to be used exclusively for the purpose of promoting the recreation, health, safety and welfare of its Members, for the care, improvement, maintenance, repair and replacement of the Common Area and all property owned by the Association, and for carrying out the functions and duties of the Association, which charge shall be in such amount as may be determined by the Board but not less than $50.00 per year on each Lot. Each Member, including Declarant, shall pay the annual charge for each Lot owned by him [or her]. The Board may increase the annual charges, but all charges shall be increased proportionately.
(i) Collection of Annual Charges. . . .
(ii) Binding Nature of Charge. . . .
(iii) Proof of Payment. . . .
(iv) Suspension of Privileges of Membership. The Board may suspend the voting privileges of any Member and the Member's right to use the Common Areas for:
(a) Any period during which any Association charge remains unpaid; and
(b) Any period of continuing violation of the provisions of this Declaration after the existence thereof shall have been declared by the Board and the Member has been given a reasonable opportunity to be heard by the Board.
(Emphases added.)
The circuit court concluded that WVA violated Section 7C(iv)(b) by not declaring the existence of Hawkins's continuing violations of the provisions of the Declaration and by not providing Hawkins an opportunity to be heard before his golf privileges were suspended on August 9, 1999. WVA maintains that the circuit court's conclusion was wrong because "Subsection 7C(iv) only applies to the suspension of a member's privileges for the member's continuing failure to pay charges levied against the member by the Association" and not to "suspension of privileges due to violations of golf rules or other provisions of the Declarations [sic] or Bylaws." Further, WVA adds, "[e]ven if . . . [Section] 7C(iv)(b) is taken out of the `unpaid charges' context, the subsection does not apply in this case because there is no continuing violation and there is no violation of the Declaration." (Emphasis in original.)
This court has previously held that
[i]n construing restrictive covenants governing the use of land, we are guided by the same rules that are applicable to the construction of contracts. The fundamental rule is that the intent of the parties, as gleaned from the entire context of the covenant, governs. As long as the terms of a covenant are not ambiguous, i.e., not "capable of being reasonably understood in more ways than one," we are required to interpret the terms "according to their plain, ordinary, and accepted sense in common speech."
Pelosi v. Wailea Ranch Estates, 10 Haw. App. 424, 435-36, 876 P.2d 1320, 1326-27 (1994) (citations omitted).
Based on our plain reading of Section 7C(iv), we disagree with WVA that the procedures set forth in the section apply only to a member's continuing failure to pay charges levied against the member by WVA. While paragraph (a) of Section 7C(iv) authorizes the WVA Board to suspend a member's right to use the Common Areas for "[a]ny period during which any [WVA] charge remains unpaid[,]" paragraph' (b) is couched in much broader terms and authorizes the WVA Board to suspend a member's right to use the Common Areas for "[a]ny period of continuing violation of the provisions of this Declaration[.]" Moreover, if we were to accept WVA's contention that Section 7C(iv) only applies to a member's failure to pay, there would be no need for subsection (b).
We agree with WVA, however, that the procedural requirements of Section 7C(iv)(b) of the Declaration did not apply to Hawkins's suspension for dangerous and disruptive conduct on the Golf Course. There are no provisions in the Declaration that specifically govern a member's behavior on the Golf Course. While the WVA Board is empowered by Sections 3A and 7B of the Declaration "to promulgate and enforce rules and regulations covering the use and enjoyment of the Common Areas," it is clear from a reading of the Declaration as a whole that the rules and regulations promulgated by the [WVA] are not considered "provisions of the Declaration" for purposes of section 7C(iv)(b). Rather, the term "provisions of the Declaration" applies to the covenants, conditions, restrictions, and other provisions expressly set forth in the Declaration that run with all lots subject to the Declaration and are binding on all parties claiming an interest in such lots.
Several provisions of the Declaration support this conclusion. First, the Recitals to the Declaration state, in relevant part, as follows:
All of the provisions of this Declaration are intended to create mutual equitable servitudes upon each of said lots and parcels in favor of each other and all other lots and parcels therein, to create reciprocal rights between the respective owners of all of said lots and parcels. All of such provisions shall, as to the owner of each such lot or parcel, his heirs, successors and assigns operate as covenants running with the land for the benefit of each and all other lots and parcels in the Development and their respective owners.
(Emphases added.) Section 4A(i) of the Declaration provides that no improvement to any lot subject to the Declaration may be constructed without the prior written approval of the Environmental Control Committee (the Committee), and Section 4A(ii) permits the Committee to "disapprove any application [for improvement] . . . which does not comply with this Declaration{.]" Additionally, Section 4A(iii) provides:
(iii) The Power to Grant Variance. The Committee may allow reasonable variances from the provisions of this Declaration if literal application thereof results in unnecessary hardship, if such variance is in conformity with the general intent of this Declaration and if the granting of such variance will not be materially detrimental or injurious to the Owners of other Lots.
(Emphases added.) Section 6B of the Declaration describes the manner in which real property may be annexed to WVA and made "subject to the provisions of this Declaration[.]" Section 10 of the Declaration provides, in relevant part, as follows:
10. GRANTEE'S ACCEPTANCE. Consent[] to[] Declaration. Each grantee or purchaser of a Lot, by acceptance of a deed conveying title thereto, or the execution of a contract for the purchase thereof, whether from Declarant, Trustee or a subsequent Owner of such Lot, shall accept such deed or contract upon and subject to all provisions of this Declaration. . . . By such acceptance, such grantee or purchaser shall for himself, his heirs, personal representatives, successors and assigns, covenant consent and agree to and with Declarant, Trustee and the grantee or purchaser of each other Lot to keep, observe, comply with and perform the covenants, conditions and restrictions contained in this Declaration.
(Emphases added.) Section 12 of the Declaration provides that
[e]very provision of this Declaration is hereby declared to be independent of, and severable from every other provision of this Declaration. If any such provision shall be held to be invalid or unenforceable, or not to run with the land, that holding shall be without effect upon the validity, enforceability or running of any other provision of this Declaration.
(Emphases added.) Section 14 of the Declaration provides that "[t]he provisions of this Declaration affect and run with the Land[.]" Finally, Section BA of the Declaration provides that "Declarant, Trustee, Association and each person to whose benefit this Declaration inures may proceed at law or in equity to prevent the occurrence, continuation or violation of any provision of this Declaration[.]" (Emphasis added.)
The Declaration also clearly distinguishes between the "provisions of the Declaration" and the "rules and regulations" adopted by WVA and does not incorporate the rules and regulations as provisions of the Declaration. Compare Sections 3A and 7B with, e.g., Section 10.
We conclude, therefore, that Hawkins's alleged violations of rules governing behavior at the Golf Course did not trigger the procedural requirements of Section 7C(iv)(b) of the Declaration.

B. WVA Was Authorized to Suspend Hawkins's Golf Privileges.
The circuit court found, based on the credible evidence, that Hawkins (1) removed golf balls from water hazards on the Golf Course, (2) removed the lucky stone on or about April 19, 1999, (3) sold golf clubs to Golf Course users in competition with the pro shop, (4) hit golf balls from his house that may have gone onto the Golf Course, (5) harassed the designer of the Golf Course, (6) struck the range picker with golf balls, and (7) ran his remote control cart onto the green while Golf Course users were teeing off. (Amended Findings of Fact Nos. 10 and 11.) The circuit court also found that Hawkins had been advised in previous correspondences that he was in violation of Golf Course rules and regulations, was required to check in prior to golfing, and could have his privileges suspended. (Amended Finding of Fact No. 11.) Hawkins has not challenged any of these findings.
Our review of the Declaration and the other documents governing Waikoloa Village that are included in the record on appeal reveals that there are no defined procedures for suspending a member's privilege to use Common Areas of Waikoloa Village for violation of rules adopted by WVA.
However, Section 3A of the Declaration provides with respect to the Common Areas of Waikoloa Village, in relevant part:
A license upon such terms and conditions as the Association shall from time to time specify for the use or enjoyment of each of the Common Areas is granted to the persons who are from time to time Members of the Association, subject to easements that may exist or be granted from time to time.
. . . Use of the Common Areas shall be subject to rules and regulations of the Association.
Additionally, Section 7 of the Declaration describes the powers and duties of WVA and states, in pertinent part, as follows:
7. THE ASSOCIATION.
A. General. The Association been or will be created as a not-for-profit corporation. Every Owner of a Residential Lot shall be a Member of the Association. . . .
B. Purpose. The purpose of the Association is to promote the common interests of the Members and to operate, maintain, repair and replace the Common Areas, and it shall have all necessary or appropriate powers to accomplish the same including, without limitation, the power to promulgate and enforce rules and regulations covering the use and enjoyment of the Common Areas, [and] to charge reasonable fees for such use[.]
(Emphasis added.) Under the foregoing provisions of the Declaration, WVA is given broad authority to promulgate and enforce rules and regulations covering the use and enjoyment of the Common Areas of Waikoloa Village. The circuit court found that "[WVA] Golf Guidelines were prepared by [the] [G]olf [C]ourse manager, [Mauro], at the instruction of the [WVA] Board" (Amended Finding of Fact No. 7), and this finding has not been challenged on appeal.
We also take judicial notice that some of the conduct that the circuit court found that Hawkins engaged in was inherently dangerous and could have subjected WVA to great liability if a third party were hurt by Hawkins's actions. HRS § 414D-149 (2004) provides, with respect to directors of nonprofit corporations, in relevant part:
General standards for directors. (a) A director shall discharge the director's duties as a director, including the director's duties as a member of a committee:
(1) In good faith;
(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
(3) In a manner the director reasonably believes to be in the best interests of the corporation.
Based on our review of the record and the unchallenged findings of fact entered by the circuit court, we conclude that the WVA Board discharged its duties prudently when it approved the one-year suspension of Hawkins's privilege to use the Golf Course, a Common Area that is an amenity rather than a necessity. Moreover, Mauro's letter of suspension to Hawkins provided Hawkins with an opportunity to appeal the suspension to the WVA Board, which Hawkins did not do. Therefore, Hawkins waived his right to complain about the suspension of his golf privileges.

C. HRS § 514A-88 Did Not Apply to WVA.
At the time the underlying case was filed, HRS § 514A-88[6] provided:
Compliance with covenants, bylaws, and administrative provisions. Each apartment owner, tenants and employees of an owner, and other persons using the property shall comply strictly with the bylaws and with the administrative rules and regulations adopted pursuant thereto, as either of the same may be lawfully amended from time to time, and with the covenants, conditions, and restrictions set forth in the declaration. Failure to comply with any of the same shall be around for an action to recover sums due, for damages or injunctive relief, or both, maintainable by the manager or board of directors on behalf of the association of apartment owners or, in a proper case, by an aggrieved apartment owner.
The circuit court concluded that "HRS Section 514A-88 mandates strict compliance with covenants and bylaws of associations of apartment owners" and that "[WVA] is an association of apartment owners and [Hawkins] is an aggrieved apartment owner under HRS Section 514-88 [sic]." (Amended Conclusions of Law Nos. 26 and 27.) The circuit court also concluded that "[n]either advice of counsel [n]or the business judgment rule excuse[d] [WVA] from [the WVA] Board's clear violations of its Declaration . . . and/or Bylaws and HRS Section 514-88 [sic]." (Amended Conclusion of Law No. 28.)
At the time the underlying case was filed on November 5, 1999, NRS 514A-88 was a part of HRS chapter 514A, which was known as "the Condominium Property Act." HRS § 514A-1 (1993). In his answering brief, Hawkins concedes that HRS chapter 514A "refers to condominium associations, and [WVA] is a planned community association[.]" We agree and conclude that the circuit court erred as a matter of law when it applied HRS § 514A-88 to WVA.

D. HRS § 421J-10(b) Did Not Authorize an Award of Attorneys' Fees and Costs to Hawkins.
After finding that Hawkins was the prevailing party pursuant to HRS § 421J-10(b), the circuit court awarded Hawkins attorneys' fees in the amount of $98,150.00 and costs in the amount of $7,619.67. MRS § 421J-10(b) provides:
Attorneys' fees and expenses of enforcement. . . .
. . . .
(b) If any member is the prevailing party in any action against an association, any of its officers or directors, or its board of directors to enforce any provision of the association documents or this chapter, then all reasonable and necessary expenses, costs, and attorneys' fees incurred by the member shall be awarded to the member; provided that no such award shall be made in any derivative action unless:
(1) The member first shall have demanded and allowed reasonable time for the board of directors to pursue an enforcement action; or
(2) The member demonstrates to the satisfaction of the court that a demand for enforcement made to the board of directors would have been fruitless.
If a member is not the prevailing party in any court action against an association, any of its officers or directors, or its board of directors, to enforce any provision of the association documents or this chapter, then all reasonable and necessary expenses, costs, and attorneys' fees incurred by the association shall be awarded to the association, unless the action was filed in small claims court, or, prior to filing the action in a higher court, the owner has first submitted the claim to mediation pursuant to section 421J-13, and made a good faith effort to resolve the dispute under any of those procedures.
(Emphases added.)
Under the plain language of the foregoing statute, the circuit court was authorized to award attorneys' fees and costs to Hawkins only if Hawkins prevailed in a lawsuit to enforce a provision of WVA documents or HRS chapter 421J and Hawkins had first demanded that the WVA Board pursue an enforcement action or demonstrated that a demand for enforcement would have been fruitless.
In Schmidt v. Bd. of Dirs. of the Ass'n of Apartment Owners of the Marco Polo Apartments, 73 Haw. 526, 836 P.2d 479 (1992), the Hawai`i Supreme Court was called upon to construe HRS § 514A-94(b) (Supp. 1991),[7] the statutory counterpart to HRS § 421J-10(b) applicable to condominium associations. In that case, the Schmidts filed a complaint against the Board of Directors of the Association of Apartment Owners of the Marco Polo Apartments (the MP Board) and Marco Polo Management (collectively, the MP Association), alleging that the MP Board was "negligently or through other breach of duty legally responsible in some fashion" for failing to correct water leakage into the Schmidts's penthouse unit from the roof of the Marco Polo Apartments. Schmidt, 73 Haw. at 528, 836 P.2d at 481.
At trial, the jury rendered a special verdict in favor of the Schmidts and the trial court awarded the Schmidts damages, but the trial court denied the Schmidts's motion for attorneys' fees and costs pursuant to HRS 514A-94(b). Id. at 529, 836 P.2d at 481. The Schmidts appealed from the order denying them attorneys' fees, costs, and prejudgment interest. Id. at 530, 836 P.2d at 481.
On appeal, the Schmidts contended that the trial court erred in ruling that HRS § 514A-94(b) did not apply to their action because their action substantiated a claim against the MP Association to enforce a provision of the Declaration or By-Laws. Id. The supreme court explained that "HRS § 514A-94(b) provides in pertinent part that `all reasonable and necessary expenses, costs, and attorneys' fees shall be awarded' to an owner who substantiates any claim `in any action against an association, any of its officers or directors, or its board of directors to enforce any provision of the declaration, bylaws, house rules, or this chapter.'" Id. at 531, 836 P.2d at 482 (emphasis in original; ellipses omitted).
The Hawaii Supreme Court held:
The fundamental starting point for statutory interpretation is the language of the statute itself. Where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Where, as in the present case, the operative language (i.e., "enforce") is undefined in a statute, we presume that the words in question "were used to express their meaning in common language." Black's Law Dictionary (6th ed. 1990) defines "enforce," inter alia, to mean "to put into execution, to cause to take effect; to compel obedience to." Id. at 528. Webster's Encyclopedic Unabridged Dictionary of the English Language (1989) defines "enforce," inter alia, to mean "to compel obedience to; to impose (a course of action) upon a person[.]" Id. at 473.
Id. at 531-32, 836 P.2d at 482 (emphases in original; citations, internal quotation marks, brackets, and ellipses omitted).
[T]he "plain and obvious" application of HRS § 514A-94(b) is to an owner's substantiated claim against an association or its board to impose an affirmative course of action upon the association to put into executionor to compel obedience toany provision of its declaration, by-laws, house rules, or any enumerated provision of HRS chapter 514A.
Id. at 532, 836 P.2d at 483 (emphasis in original). The supreme court also concluded that
the Schmidts did net seek to enforce any affirmative action on the part of the Association to comply with any provision of the Association's declaration, by-laws, house rules, or HRS chapter 514A; rather, in their own words, they were "seeking damages for the Association's failure to comply with the By-Laws and Declaration." As in any common, "garden variety" tort action, the Schmidts were seeking damages from the Association for the breach of a duty owed to them, i.e., the Association's failure to enforce its declaration and by-laws. In the absence of any prayer for equitable, mandatory, or injunctive relief to compel obedience to the Association's declaration, by-laws, house rules, or any enumerated provision of HRS chapter 514A, HRS § 514A-94(b) does not apply to the Schmidts' action.
Therefore, we hold that the trial court did not err in denying the Schmidts' motion for attorneys' fees and costs pursuant to HRS § 514A-94(b).
Id. at 533, 836 P.2d at 483 (brackets and ellipsis omitted; emphases in original). This reasoning applies with equal force to an interpretation of HRS § 421J-10(b).
In this case, as in Schmidt, Hawkins did not seek to enforce any provision of the WVA governing documents or HRS chapter 421J. Hawkins did not, for example, seek to compel the WVA Board to declare that he was in continuing violation of the provisions of the Declaration. Hawkins alleged two grounds for relief in his complaint. In Count I, he sought damages for WVA's alleged breach of Section 7C(iv)(b) of the Declaration. In Count II, which was dismissed by the circuit court, he sought a mandatory injunction to compel WVA to restore his golf privileges. Since Hawkins did not seek to enforce any affirmative action on the part of WVA to comply with any provision of the Declaration, WVA's by-laws, house rules, or HRS chapter 421J and sought instead to recover damages from WVA for breach of a contractual duty allegedly owed to him, HRS § 421J-10(b) was not applicable to his case. Therefore, even if Hawkins had prevailed in his lawsuit, the circuit court erred in awarding him attorneys' fees and costs pursuant to HRS § 421J-10(b).

CONCLUSION
In light of the foregoing discussion, we reverse that part of the Amended Final Judgment filed on June 3, 2003 that entered Final Judgment on Count I of the complaint in favor of Hawkins and against WVA in the amount of $109,447.67. In all other respects, we affirm the Amended Final Judgment. We also vacate the following conclusions of law entered by the circuit court in its "Amended Findings of Fact and Conclusions of Law; Order" filed on April 11, 2003: Conclusions of Law Nos. 24, 25, 27, 28, 29, 30, 31, 34, and 35. Our disposition of this appeal renders it unnecessary to address the other points on appeal raised by WVA and Hawkins.
NOTES
[1] The Honorable Riki May Amano presided.
[2] Hawaii Revised Statutes (HRS) § 421J-10 (2004) provides currently, as it did during the proceedings below, in relevant part:

Attorneys' fees and expenses of enforcement. . . .
(b) If any member is the prevailing party in any action against an association, any of its officers or directors, or its board of directors to enforce any provision of the association documents or this chapter, then all reasonable and necessary expenses, costs, and attorneys' fees incurred by the member shall be awarded to the member; provided that no such award shall be made in any derivative action unless:
(1) The member first shall have demanded and allowed reasonable time for the board of directors to pursue an enforcement action; or
(2) The member demonstrates to the satisfaction of the court that a demand for enforcement made to the board of directors would have been fruitless.
If a member is not the prevailing party in any court action against an association, any of its officers or directors, or its board of directors, to enforce any provision of the association documents or this chapter, then all reasonable and necessary expenses, costs, and attorneys' fees incurred by the association shall be awarded to the association, unless the action was filed in small claims court, or, prior to filing the action in a higher court, the owner has first submitted the claim to mediation pursuant to section 421J-13, and made a good faith effort to resolve the dispute under any of those procedures.
(c) Nothing in this section shall be construed to prohibit the board of directors from authorizing the use of a collection agency.
HRS § 421J-2 (2004) defines "Member" as "the person or persons owning a unit or having the right of occupancy of a unit under a recorded lease having a term of twenty or more years from its commencement date; or anyone included in the definition of a member under the association documents, including the developer, whether or not the developer owns a unit."
[3] HRS § 421J-2 (2004) was initially enacted into law pursuant to 1997 Haw. Sess. L. Act 132, § 1 at 247-48, and was amended in 2001 to provide that the definition of a "[p]lanned community" does not include "a time share plan[.]" 2001 Haw. Sess. L. Act 68, § 1 at 118.
[4] The Declaration of Protective Covenants (Declaration) for Waikoloa Village states that the real property subject to the Declaration includes "all that real property situated in the County and State of Hawaii, described in the Supplemental Declaration" attached to the Declaration as Exhibit A "and all other real property which may be annexed thereto as provided herein." No copy of the Supplemental Declaration or any annexation thereto is included in the record on appeal.
[5] For example, the Declaration includes provisions applicable to residential lots that: prohibit accessory outbuildings (garages, sheds, etc.) from being built before a dwelling is built on a lot; prohibit accessory outbuildings from being used for human habitation; require construction of improvements on a lot to be completed within nine months; prohibit placement of used buildings on any lot; require each lot and improvements placed thereon to be maintained in good and clean condition; prohibit construction of an outside toilet on any lot; require concealment of utilities, fuel storage tanks, trash receptacles, and laundry drying facilities; regulate signs, vehicle parking, and the keeping of animals; impose restrictions on temporary structures, removal of trees, erection of antennae, and location of ditches and swales; prohibit drilling and mining on a lot; and impose specific requirements for the construction of a single-family dwelling on a residential lot.
[6] HRS § 514A-88 (1993) was repealed by 2004 Haw. Sess. L. Act 164, § 26 at 755.
[7] HRS § 514A-94(b) (Supp. 1991) provided, in relevant part:

Attorneys' fees and expenses of enforcement. . . .
(b) If any claim by an owner is substantiated in any action against an association, any of its officers or directors, or its board of directors to enforce any provision of the declaration, bylaws, house rules, or this chapter, then all reasonable and necessary expenses, costs, and attorneys' fees incurred by an owner shall be awarded to such owner; provided that no such award shall be made in any derivative action unless:
(1) The owner first shall have demanded and allowed reasonable time for the board of directors to pursue such enforcement; or
(2) The owner demonstrates to the satisfaction of the court that a demand for enforcement made to the board of directors would have been fruitless.